(No. 63917.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. STANLEY BOCLAIR, Appellant.

*Opinion filed September 20, 1989.*

RYAN, J., joined by STAMOS, J., dissenting.

Michael L. McCluggage, Christopher A. Keele, Sarah L. Olson and Elizabeth A. Sanders, of Wildman, Harrold, Allen & Dixon, of Chicago, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Robert J. Ruiz, Solicitor General, Terence M. Madsen and Jack Donatelli, Assistant Attorneys General, and Jean M. Cocozza, law student, all of Chicago, of counsel), for the People.

CHIEF JUSTICE MORAN delivered the opinion of the court:

Defendant, Stanley Boclair, an inmate at the Pontiac Correctional Center, was indicted in the circuit court of Livingston County on four counts for the murder (Ill. Rev. Stat. 1983, ch. 38, pars. 9—1(a)(1), (a)(2)) of Thomas Riley, a fellow inmate. Eight months later, defendant was also indicted on one count of conspiracy to commit said murder (Ill. Rev. Stat. 1983, ch. 38, par. 8—2(a)). The two indictments were consolidated for trial. Prior to

trial, defendant waived his right to have the jury sit on the aggravation and mitigation portion of the case. A jury found defendant guilty on all five counts. The trial court, at a separate sentencing hearing, found that the necessary aggravating factors existed and that there were no mitigating factors sufficient to preclude the imposition of the death penalty, and sentenced defendant to death.

By direction of the trial judge, a notice of appeal was filed in this court on August 8, 1986. Defendant thereafter filed a post-trial motion in the trial court on August 15, 1986, but since the trial court had been divested of jurisdiction, defendant then filed, in this court, a motion to remand the cause to the trial court for the limited purpose of deciding his post-trial motion for a new sentencing hearing. This court allowed the motion. On remand the trial court denied the post-trial motion.

On appeal, defendant raises the following issues: (1) the evidence did not establish his guilt beyond a reasonable doubt; (2) the trial court, (a) made erroneous evidentiary rulings, (b) erred in admitting into evidence his statement to prison investigators, and (c) erred in requiring him to produce his investigator's notes, thereby depriving him of the effective assistance of counsel, due process, and the right against self-incrimination; (3) production of the notes violated his sixth amendment right to counsel; (4) the State improperly questioned the jury about the death penalty; (5) he was deprived of a fair, impartial and unanimous jury; (6) the trial court erred in sentencing him to death; and (7) the Illinois death penalty statute is unconstitutional.

The theory of the State's case was that defendant and two other inmates, Robert Jones and Charles Jordan, killed the victim in furtherance of a conspiracy among a group of inmates.

The evidence reveals that Thomas Riley, the victim, was murdered on October 7, 1984. He died of multiple stab wounds to the thigh, head, back and chest area, with penetration of the heart. The murder occurred on or near the back of seven gallery, of the south cellhouse at the Pontiac Correctional Center. After the murder, the five and seven galleries were placed under lock-down conditions, and the inmates were confined to their cells. Interviews were conducted by investigators the day of the murder with the inmates of five and seven galleries, and with correctional officers. Follow-up interviews were conducted over the course of the next few days. Defendant was not interviewed until nine days later.

The State introduced the testimony of four inmates, three of whom, Kenneth Broughton, James Cameron, and Craig Chothen, saw the murder. The fourth, Brian Trimble, was present at a meeting at which the victim's murder was planned.

Broughton testified that at the time of the murder he was sitting on a windowsill and was scanning five and seven galleries when he saw Jones, Jordan, defendant and the victim on the back of seven gallery, near cell 751 or 752. Broughton said that they seemed to be talking and defendant acted as though he was going to walk away. Instead, defendant turned around and stabbed the victim.

On cross-examination, Broughton admitted that his trial testimony differed in some respects from the statements he had given to Investigator Irvin.

James Cameron testified that he was walking towards the back of five gallery when he noticed Jones, Jordan, a west cellhouse resident and the victim on the back landing of five gallery. As he continued walking towards the back he saw them and the defendant enter on seven gallery, where they stood approximately two cells away from the back landing. It appeared that the victim

had already been wounded because there was blood on his head and shoulders. A scuffle ensued and the defendant then hit the victim "in the chest with a blow with a shank." The victim fell over the railing, landed on his feet on five gallery and then fell to the ground. Cameron went to the back of five gallery and saw the victim lying there. Cameron said he started to walk towards the front of the gallery and, about five minutes later, saw defendant and Jordan near the middle of five gallery holding brooms and sweeping. Cameron noticed that defendant had changed clothes and was now wearing a sweat jacket. During the lock down, and prior to being interviewed on the night of the murder, Cameron passed a note to Lieutenant Eddie Ringo, which read:

"BO-ClAiR 'MADE The hit' 7 'GAllERy.' "

On cross-examination, Cameron stated that he had been a member of the gang's "five gallery security team," that he did not mention the west cellhouse resident at the first interview, but he did say something about him at the second interview. Also at the second interview, Cameron said that he told an investigator that defendant had been wearing a blue jean jacket at the time of the murder, while Jordan had been wearing a dark blue hooded sweat shirt.

Craig Chothen testified that the night before the murder he saw Jones and James Wilcox, the "gang's leader in prison," talking with the victim on five gallery, near the window opposite cell 508. He did not hear the conversation but said it looked as if they were arguing. Before breakfast on the day of the murder, Chothen said he saw Jones and Wilcox talking to the victim, in the same area as the previous night, and heard Jones say to Riley, "Man, you owe us."

Chothen testified that he was on the stairway going up to seven gallery when he heard "a moan" up on seven gallery. He looked up and saw "three guys swing-

ing shanks" at the victim. Chothen identified the "three guys" as defendant, Jones and Jordan. Chothen stated that he backed away from where he was standing and heard a "thump on the floor," turned around and saw the victim wobble on his feet and fall to the floor. Chothen then went back into five gallery to get his jacket from his cell.

On cross-examination Chothen admitted that he had never told the investigators that he returned to five gallery after witnessing the murder, until he had viewed a videotape which showed him walking back and forth on five gallery. Chothen admitted that he clarified his earlier statements to reflect the fact that he returned to five gallery. Chothen also admitted that he had been a gang member for 12 years, but said he left the gang after the murder.

Brian Trimble, a third gallery resident in the south cellhouse, testified that just before the murder he was in the yard where he saw some gang members talking, through the fence, with an inmate in the west cellhouse yard. Trimble walked over to the group and they were discussing the "hit" on the victim. According to Trimble, Wilcox said that word came down from Larry Hoover, the leader of the "whole [gang] nation," that the victim had to be hit. Melvin Jones, the gang's chief of security, explained to the group that he wanted defendant, Jordan, and Robert Jones "to take care of the hit." Robert Jones was to coordinate and set up the hit and defendant and Jordan were to "kill" the victim. Trimble identified those present at this meeting as Wilcox, Melvin Jones, Jordan, Robert Jones, Fontaine, defendant and himself. Trimble also said that he had not been interviewed by investigators and had not come forward with this information until seven months after the murder, following a prison gang assassination attempt on his life.

David Turner, a correctional officer, testified that after the murder he saw defendant around cell 730 or 735. Turner said that defendant seemed "peculiar" because he was just standing there not paying attention to what was going on, while everyone else was at the back of the gallery looking over the railing or trying to see what was happening.

Correctional Officer Michael Jones testified that he had let defendant out of his cell on the morning of the murder. Jones recalled that defendant was wearing blue jean pants and a blue jean jacket. After the murder, Jones was instructed to secure seven gallery. When Jones locked the defendant in his cell, Jones noticed that defendant was not wearing the blue jean jacket he wore earlier that day.

Edward Kallal, an Illinois State Police crime scene technician, testified that, on the day of the murder, he took photographs of the crime scene, attended the victim's autopsy and collected standards, including blood, palm and fingerprints from the victim, and collected swabs of blood from the crime scene.

Kallal also testified that Officer Langlois gave him defendant's leather gloves, and that the clothing came from defendant's cell. Kallal stated that when he, Officer Langlois, and some guards conducted a search of defendant's cell around 8 p.m. on the night of the murder, he took defendant's blue jean jacket and tennis shoes because they appeared to have blood on them. When Kallal inquired about the clothes, defendant identified the items as his and told Kallal the blood had gotten on his clothes two weeks before. Kallal stated that he could not tell if defendant had "done his laundry" but defendant's blue jean jacket was damp. Kallal also testified that all the evidence he collected or received was turned over to the State Police laboratory.

Terrance Delaney, a special agent captain with the Illinois State Police, testified that on the day of the murder he was on assignment to the Department of Corrections as its chief investigator, and he received a call summoning him to the Pontiac Correctional Center. Delaney said that he toured the crime scene, observed what work had been done by the crime scene technician, began reviewing reports, was made aware of the interviews that had been conducted with the correctional officers, and was told of Cameron's note to Lieutenant Ringo.

Delaney then organized the inmate interviews. He restricted the interviews to the inmates of the five and seven galleries, because the majority of the inmates from the six and eight galleries were not in the cell area at the time of the murder. Those inmates who remained on the six and eight galleries at the time of the murder were locked in and could not get out. Interviews with other inmates were conducted as information surfaced from the interviews with five and seven gallery inmates.

Delaney said that there were some differences between first and second interviews of several inmates, but the discrepancies were usually clarified in the second interview. He also acknowledged that Chothen gave four statements; the fourth being restricted to Chothen's movements as depicted on the videotape. Delaney said that defendant was not interviewed on the day of the murder, but that he was interviewed on two occasions: once formally, and once informally at defendant's request.

Diane Schneider, a forensic scientist with the Illinois State Police, testified on behalf of the State and the defense. She stated that she received a number of items from Kallal on October 16, 1984, and again on October 31, 1984. Schneider said she also received blood stand-

ards from the victim, defendant and Ferrell Morris, another inmate.

Schneider said she analyzed the blood swabs for ABO typing and standards and found them to contain human blood, the results of which would include the victim as a possible donor, but exclude the defendant. She also observed what appeared to be bloodstains on the back of defendant's leather gloves, the back of the palm area, the fingers, and on the inside wrist of the right glove. Schneider tested the stains and identified human blood, but was unable to determine whether the blood type was consistent with that of the victim or the defendant. She found a stain on the left pocket of defendant's blue jean jacket to be blood of a type consistent with defendant or Ferrell Morris. She tested a stain in the shoulder area of the jacket, near the right sleeve, and although the results were inconclusive, she said that the source possibly could have been the victim. Similarly, she tested the scattered small stains found on defendant's tennis shoes. The tests revealed the presence of human blood, but there was no ABO substance which made the results inconclusive as to the source. There were stains on defendant's blue jean pants which Schneider found to be human blood, but detecting no antigenic activity she was unable to identify the source. She also said that washing a garment would affect the fluids.

Defendant introduced the testimony of inmate Clifton Hale, Jr., who testified that on the day of the murder, he was housed in cell 701 in the south cellhouse. Hale said that after breakfast he saw defendant in defendant's cell. Hale said that he was on his way to the yard when he returned to his "house" to get his cigarettes, after which he started walking towards the back gate on seven gallery. When he reached cell 708 or 709, Jordan, defendant's cellmate, shouted to him from five gallery asking Hale to get him a cigarette from defendant. Hale

said he went to the cell, knocked on the doorway, got a cigarette from defendant and threw it down to Jordan, and resumed walking down seven gallery. As he approached cell 730, he saw something go over the railing and heard a noise, but he could not tell what it was. As Hale got to cell 740, he looked down and saw a body lying on the floor of five gallery. Hale never mentioned the cigarette incident in either of his two statements to investigators.

Inmate Ferrell Morris, an eight gallery resident in the south cellhouse, testified for the defense. Morris stated that on two occasions before the murder he had been bleeding when he was near the defendant. The first time was about a week before the murder when he was involved in a fight, but he did not come into physical contact with the defendant at that time. The second time occurred two to three days before the murder, when defendant stopped by Morris' cell while Morris was fighting with two other inmates. Morris testified that he was bleeding from the nose and mouth and when defendant came into the cell, he hugged the defendant.

Defendant testified that he lived in cell 707 in the south cellhouse and that October 7, 1984, was his 27th birthday. He stated that he, his cellmate Charles Jordan, and John Coleman, an eight gallery resident, had planned to celebrate his birthday in Coleman's cell. Defendant said that, after waking up, he "washed up" and put on a blue zip-up sweatshirt, not his blue jean jacket, a pair of blue jeans and work boots. He and Jordan went to buff the back landing of five gallery until breakfast.

Defendant said that he went to breakfast with Jordan but left the dining room alone, went up to seven gallery, and headed into his cell. Defendant said that he began talking to a Latino inmate on five gallery, who "lived between 501 and 507." Defendant said that while he was

talking to the Latino inmate someone on seven gallery came and asked him for a cigarette for Jordan. Defendant said he went into his cell, got a cigarette, went back out and gave it to the person, and then resumed talking to the Latino inmate.

Defendant stated that he did not hear or see anything unusual, but he did notice people gathering on the back of seven gallery. He started walking toward the back of seven gallery and got to the middle of the gallery when he leaned over the railing and looked toward the back of five gallery. He did not see the body, but he did see seven or eight people milling around in a circle on the back of five gallery. Defendant said that, after being on seven gallery for six to seven minutes, he jumped to five gallery somewhere around cell 710 when he saw Jordan. They started to talk and then walked towards the front of five gallery and stopped by a window. They stayed there until they saw the stretcher bearing the victim's body being carried into the yard, and then they picked up brooms to sweep the gallery.

Defendant said that when the majority of the gallery had been locked up, he and Jordan were let out onto the back landing where they finished buffing the landing. From there they went to the seven gallery landing and began buffing it.

He said that Officer Jones locked him up, and later that evening, Kallal and three correctional officers came to his cell. Defendant said he turned over his blue jean jacket, white tennis shoes and tan leather gloves, and the jacket was not wet and he had not washed it. Two days later, defendant said he was taken to the condemned unit in the north cellhouse.

Defendant testified that he got blood on his blue jean jacket when he was hugged by inmate Ferrell Morris; at that time, he was also wearing his white tennis shoes. He said this incident took place only a few days before

the murder. Morris' blood was on the wall, floor, blankets and his coat, and after the hug he may have put on his leather gloves to help Morris clean up the blood.

Defendant said that after he was moved to the north cellhouse, but before being interviewed by investigators, he received a disciplinary ticket which informed him that he was under investigation for a homicide. Defendant also knew he was a suspect in the victim's murder, but he did not speak with investigators until October 16, 1984, after being in the condemned unit for a week. He said he felt a lot of pressure, was in shock, scared, and confused, although while in the condemned unit he had such privileges as visitation, hospital care and exercise.

Defendant stated that before the investigators interviewed him, they read him his "rights" and told him he had a right to a lawyer. Defendant said he agreed to talk to them, and he knew he had a right to an attorney but he did not request one. In this interview, defendant never mentioned that he had talked with a Latino or any other alibi witness, nor did he mention the cigarette incident. Defendant said that he knew one of the investigators, Doug Read, who had been a guard at Pontiac, and had not fared too well in the past with Read. He was nervous and uncomfortable at the interview and was told before the interview "that they would seek the death penalty." Defendant also said that he and James Cameron were on bad terms. Finally, he denied committing, or conspiring to commit, the murder.

Defendant first contends that his conviction should be reversed because the evidence failed to establish his guilt beyond a reasonable doubt. He makes several arguments in support of his contention: he has consistently maintained his innocence and presented evidence in support of his innocence; the trial court recognized that there was evidence supporting his defense; the State's witnesses gave inconsistent testimony; the inmate gang

members' testimony was so inconsistent as to be legally insufficient; he was being "set up"; and the physical evidence contradicts the testimony of the State's witnesses. The State responds that the defendant is merely contesting the fact that the inmates' testimony should not have been believed by the jury. The State argues that the jury was fully aware of the discrepancies and inconsistencies that were present in the case; that it was the jury's duty to resolve them; and that the totality of evidence supports the jury's guilty verdict.

The purpose of a jury is to make available the commonsense judgment of the community as a hedge against the overzealous or mistaken prosecutor. (*Taylor v. Louisiana* (1975), 419 U.S. 522, 530, 42 L. Ed. 2d 690, 698, 95 S. Ct. 692, 698.) It is the jury's duty to assess the credibility of witnesses and to weigh the evidence in determining a defendant's guilt or innocence. (See, *e.g.*, *Glasser v. United States* (1942), 315 U.S. 60, 80, 86 L. Ed. 680, 704, 62 S. Ct. 457, 469; *People v. Byron* (1987), 116 Ill. 2d 81, 90.) That determination is entitled to great deference, and when the sufficiency of the evidence is challenged we will not retry the defendant, although it is our duty to set aside a conviction when the evidence raises a reasonable doubt of defendant's guilt. (*People v. Sanchez* (1986), 115 Ill. 2d 238, 260; *People v. Collins* (1985), 106 Ill. 2d 237, 261.) On review, " 'the relevant question is whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *Collins*, 106 Ill. 2d at 261, quoting *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789.

Based upon the evidence, the jury found defendant guilty beyond a reasonable doubt. After our review of the record, we cannot say that the jury's verdict is so

unsatisfactory, unreasonable or improbable as to raise a reasonable doubt of the defendant's guilt. The jury's verdict is not diminished because inmates testified for one side or the other. (See, *e.g.*, *People v. Brisbon* (1985), 106 Ill. 2d 342, 360-62.) Although there may have been minor inconsistencies in the testimony, we believe, as did the trial court, that there was sufficient and substantial evidence to establish a *prima facie* case and establish issues of fact which were within the jury's province to decide. We, therefore, find defendant's arguments on this issue to be without merit.

Defendant next contends that the trial court committed reversible error by admitting into evidence his statement made to investigators nine days after the murder. Defendant asserts that the statement was obtained in violation of his fourth, fifth, sixth and fourteenth amendment rights. Defendant points out that he was isolated from the general prison population, held in the condemned unit of the prison and told he was being investigated for murder, but was not provided with the details of the charges against him while being told the State would seek the death penalty. Defendant maintains that these facts, coupled with his preexisting paranoid state, lead to the conclusion that his statement was not voluntarily, intelligently or knowingly made. Defendant further maintains that because of psychological coercion, fear and intimidation, he did not waive his right to remain silent. The State responds that defendant has procedurally defaulted this issue by failing to adequately make a record for review, because he never raised a voluntariness issue in the trial court. The State asserts that the defendant could have made a motion to suppress the statement from use in the State's case in chief, made a motion *in limine* to prevent the State from using it for impeachment, or objected at trial when the State attempted to introduce the statement into evidence.

We agree with the State, but for reasons different from those cited. Defendant was not required to make a pretrial motion to suppress to preserve this issue for appeal, because the statement was neither an admission nor a confession. (See Ill. Rev. Stat. 1983, ch. 38, par. 114—11.) A motion *in limine* or an objection at trial would have preserved the issue, provided that it was also raised in a post-trial motion. Defendant's attempt to raise this issue on appeal must fail as he did not preserve it in his post-trial motion. (*People v. Lucas* (1981), 88 Ill. 2d 245, 250.) Even assuming the issue has not been waived, we find no merit to defendant's argument as he admits that he was read his rights, understood them, and then agreed to talk to the investigator. Furthermore, although defendant was in the condemned unit, he still had prison privileges such as visitation, hospital care and exercise. Under these circumstances we cannot say that defendant's constitutional rights were violated.

Defendant also asserts that his conviction must be reversed because the trial court made several erroneous evidentiary rulings. Defendant claims error in: admitting expert testimony regarding blood samples; excluding evidence that the victim had carried a concealed shank; and excluding evidence of a prior murder conviction of one of the State's witnesses. The State responds that the trial court did not abuse its discretion. In the alternative, the State argues that if the rulings were error, they did not prejudice the defendant. The State also argues that defendant has waived the issue concerning admission of the blood analysis by failing to raise it in a post-trial motion.

Evidentiary rulings are within the sound discretion of the trial court and will not be disturbed on review unless the trial court has abused its discretion. (*People v. Johnson* (1986), 114 Ill. 2d 170, 193.) To begin, the trial court

denied defendant's motion *in limine* to exclude blood sample evidence and allowed Diane Schneider, a forensic scientist, to present testimony relative to the blood sample evidence. The judge's ruling on this matter only went to the admissibility of the evidence, not its weight, which was to be determined by the jury. Accordingly, the trial court did not abuse its discretion in admitting this evidence. See, *e.g.*, *Johnson,* 114 Ill. 2d at 197.

Nor did the trial court abuse its discretion in excluding, on relevancy grounds, evidence that the victim was carrying a "shank" at the time of his death. " ' "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable than it would be without the evidence.' " (*People v. Monroe* (1977), 66 Ill. 2d 317, 322, quoting Fed. R. Evid. 401.) Here, testimony whether the victim was carrying a shank was irrelevant for two reasons. First, the defendant did not raise an issue of self-defense. Second, there was no evidence presented at trial that the victim had drawn the shank to defend himself.

Defendant asserts that the trial court erred in limiting the scope of cross-examination of Craig Chothen, to the date and nature, but not the circumstances, of Chothen's murder conviction. Defendant also asserts that Chothen gave inconsistent testimony. Defendant argues that by limiting the cross-examination of Chothen, the trial court prevented him from demonstrating the existence of a significant reasonable doubt as to his guilt. The State argues that defendant brought out impeaching and inconsistent testimony during his extensive cross-examination of Chothen; therefore, the trial court did not manifestly prejudice the defendant by limiting the scope of cross-examination.

The scope of cross-examination concerning the circumstances of a witness' prior conviction is within the

trial court's sound discretion, and absent an abuse of that discretion which results in manifest prejudice to the defendant, the ruling will not be overturned on review. (*People v. Brisbon* (1985), 106 Ill. 2d 342, 362.) While the State opened the door on direct examination by inquiring into the witness' past convictions, limits may be placed on the scope of cross-examination once the door has been opened. The opening is not a funnel through which the circumstances of prior convictions can be poured. The witness was not the one on trial and to dredge up the details of his prior conviction would only muddy the waters. (See, *e.g., People v. McDonald* (1975), 62 Ill. 2d 448.) The jury, following Chothen's testimony and the defense's probing cross-examination, was in the position to judge his demeanor and credibility. The trial court's ruling did not interfere with the jury's duty or ability to make those judgments, nor did it prejudice the defendant. Accordingly, we cannot say that the trial court abused its discretion in limiting the scope of cross-examination. See *People v. Harris* (1988), 123 Ill. 2d 113, 144-45.

Defendant argues next that the trial court's discovery order requiring the defense to produce its investigator's notes violated his right to counsel, his right to effective assistance of counsel and his right against self-incrimination. The facts surrounding this claim are set forth in our earlier opinion. (*People v. Boclair* (1987), 119 Ill. 2d 368.) We only present those facts necessary for resolving the issues presented here.

When the defendant was arraigned the court appointed the public defender to represent him. The public defender obtained a court order appointing a private investigator to assist him in investigating the case. The public defender withdrew upon the appointment of private counsel, who also retained the services of the same private investigator. Both sides moved for discovery. The

State in one of its responses listed nearly 200 potential witnesses and the defense interviewed many of them. The State subsequently moved for discovery of the investigator's notes concerning those interviews. The trial court granted this discovery request and ordered defense counsel to produce discoverable materials, but he refused. The trial court then found defense counsel in contempt of court and sentenced him to six days' conditional discharge. The defense attorney appealed, contending discovery was barred by the work product doctrine. The appellate court agreed (139 Ill. App. 3d 350), and it reversed the trial court. On review, this court determined the case was moot, but we found that the work product doctrine is not an absolute and that it did not necessarily preclude the discovery of the investigator's notes, and this court reversed the appellate court, and enforced the contempt order. 119 Ill. 2d 368.

Following the appellate court decision, and prior to our ruling, the trial court required the defense to submit the investigator's notes for an *in camera* inspection before the State cross-examined a defense witness. The purpose for the *in camera* inspection was to determine whether anything in the notes was subject to discovery by the State. Defense counsel "specific[ally]" objected on the basis of defendant's right to counsel, his right against self-incrimination, and the Illinois discovery rules. The defendant reasserted these claims in his posttrial motion. Defendant also raised the work product argument. He also raises, for the first time, a due process argument.

Defendant argues that the discovery order would chill criminal defense trial preparation and investigation, result in the defense doing the prosecutor's job, and unduly intrude into the defense's investigative efforts. The State responds that the doctrine of the "law of the case" bars the relitigation of these issues and that if we reach

the merits, the claim should be denied as defendant has failed to timely present the constitutional bases for this argument in the trial court.

We have already decided the work product doctrine argument adversely to the defendant (119 Ill. 2d 368) and under the "law of the case" we need not reexamine that claim (see, *e.g.*, *Serbian Eastern Orthodox Diocese v. Milivojevich* (1979), 74 Ill. 2d 574, 579; *City of Chicago v. Collin* (1925), 316 Ill. 104, 113-14). We disagree, however, with the State that the law of the case precludes our consideration of the remaining issues concerning the constitutional bases of defendant's arguments, because the issues were preserved by an objection at trial and they were reasserted in a written post-trial motion. Therefore, we reach the merits of defendant's contentions that he was denied the effective assistance of counsel and his privilege against self-incrimination, but defendant has waived his due process claim by failing to object on this basis at trial. *People v. Enoch* (1988), 122 Ill. 2d 176, 186-88.

In his effective-assistance-of-counsel argument, defendant asserts that his investigators did the prosecutor's work, and that the State used the notes to buttress and perfect its case in chief, as well as to cross-examine defense witnesses. Defendant also contends that acceptance of the disputed discovery order will inhibit a criminal defendant from being free and open with his counsel, and will discourage defense counsel from conducting a rigorous investigation to unveil facts or evidence. Defendant relies upon *State v. Williams* (1979), 80 N.J. 472, 404 A.2d 34, and a footnote in *Weatherford v. Bursey* (1977), 429 U.S. 545, 554 n.4, 51 L. Ed. 2d 30, 39 n.4, 97 S. Ct. 837, 843 n.4, to support his contentions. We find those cases to be inapposite.

*Williams* dealt with the discovery of inculpatory material unveiled, not by the State, but by the defense. This case involves no such factual similarity.

Defendant's reliance on the *Weatherford* footnote is similarly misplaced. The language of the footnote is taken out of context in defendant's brief. The footnote states, in relevant part, that the "Sixth Amendment's assistance-of-counsel guarantee can be meaningfully implemented only if a criminal defendant knows that his communications with his attorney are private and that his lawful preparations for trial are secure against [the surreptitious or clandestine] intrusion by the government." (429 U.S. at 554 n. 4, 51 L. Ed. 2d at 39 n.4, 97 S. Ct. at 843 n.4.) The thrust of this passage is that it is the attorney-client communications which must be safeguarded, not those of third parties or potential witnesses. See also *United States v. Nobles* (1975), 422 U.S. 225, 233-34, 45 L. Ed. 2d 141, 151, 95 S. Ct. 2160, 2167-68.

Here, the trial court's *in camera* inspection of the contested notes safeguarded the defendant's right to the effective assistance of counsel. The trial court excised irrelevant and privileged matter, and ordered defendant to turn over only the portions of the notes that contained factual statements which could fairly be said to be the witness' own words. (*Boclair*, 119 Ill. 2d at 376.) Accordingly, we cannot conclude that the defendant was deprived of the effective assistance of counsel.

Defendant also argues that the discovery order violated the privilege against self-incrimination by requiring him to work against his own interests by disclosing to the State information which would be used against him. The discovery order only exposed to production, after the trial court's *in camera* inspection, that material which the State was entitled to under the rules of discovery (107 Ill. 2d R. 413). The scope of the discovery

order did not extend to privileged matter. The trial court excised irrelevant and privileged matter, thus insuring that only discoverable material was to be produced. The discovery order did not threaten or undermine the attorney-client privilege or disturb that relationship. Defendant's contention that the State "used the notes to buttress and perfect its case-in-chief" is unsupported by any record citation and our review of the record fails to disclose any such occurrence. Defendant's allegation that the notes were used to cross-examine the defense investigator also does not persuade, as by taking the witness stand the investigator and the defense clearly waived any privilege. *United States v. Nobles* (1975), 422 U.S. 225, 239-240, 45 L. Ed. 2d 141, 154, 95 S. Ct. 2160, 2170-71.

Defendant also asks this court to extend State constitutional protections against this type of discovery. Defendant relies on two cases from other jurisdictions, *In re Misener* (1985), 38 Cal. 3d 543, 698 P.2d 637, 213 Cal. Rptr. 569, and *Scott v. State* (Alaska 1974), 519 P.2d 774, which he argues reflect a more enlightened view of State guarantees against self-incrimination and discovery in the criminal area.

These two courts have interpreted their State constitutions more expansively than the United States Supreme Court has construed the right against self-incrimination. These decisions also reflect a minority view. Moreover, defendant presents us with no argument whatsoever, other than mere case citation, in his effort to expand our State's constitutional protections. We are unpersuaded by defendant's contention and adhere to the discovery provisions of our rules (107 Ill. 2d R. 411 *et seq.*).

We next consider whether defendant was denied a fair and impartial jury. Defendant argues that the State improperly questioned veniremen about the death pen-

alty, which resulted in a death-qualified and conviction-prone jury, and that in permitting this questioning the court erred in not sequestering the venire. The State responds that defendant has defaulted on whether the State improperly questioned a venireman about the death penalty by failing to object at trial.

Our review of the contested *voir dire* examinations reveals no timely objection to any alleged error committed by the prosecutor during his inquiry of the venireman at which purportedly death-qualifying questions were asked. Indeed, the defendant waited until the next morning, following the prosecutor's inquiry and after the panel had been sworn, to object. Such an objection can hardly be considered timely and defendant has therefore waived the issue. *People v. Evans* (1988), 125 Ill. 2d 50, 61-62.

Defendant also asserts that an otherwise qualified venireman, Gary Brauman, was improperly dismissed from the jury in violation of the *Witherspoon* standard. The State argues that there is no *Witherspoon* issue in this case.

We agree with the State. This court has held that even where a defendant waives a jury at the sentencing phase, as defendant did here, a jury that is questioned about the death penalty is still presumed to be a fair jury on the issue of guilt or innocence. (*People v. Erickson* (1987), 117 Ill. 2d 271, 292.) Defendant has failed to muster any evidence to rebut this presumption.

Additionally, *Witherspoon* held general objections to the death penalty could not support a challenge for cause. (*Witherspoon v. Illinois* (1968), 391 U.S. 510, 522-23, 20 L. Ed. 2d 776, 784-85, 88 S. Ct. 1770, 1777.) Venireman Brauman, however, stated that he could not be fair in determining defendant's guilt or innocence. It was not error to excuse him for cause. *Wainwright v.*

*Witt* (1985), 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52, 105 S. Ct. 844, 852.

Defendant next contends that the trial court committed reversible error by disregarding juror John R. "Bob" Vercler's recantation of his guilty verdict. The jury had the case under consideration for over 24 hours, having first started deliberations at 2:40 p.m. on April 18, 1986. Eight hours later it had not reached a verdict. When the jury assembled in open court, at 11 p.m. that evening, the trial court gave a *Prim* instruction (*People v. Prim* (1972), 53 Ill. 2d 62, 75-76) and sequestered the jury for the night. The jury resumed deliberations at 9 a.m. the next day. At 3:55 p.m. the jury returned its verdict of guilty on all five counts. The jury was polled and each juror, in open court, affirmed their written verdict in counts I through V. The jury was then excused from service.

The defense subsequently received an undated and unsolicited letter, postmarked April 28, 1986, from Vercler. The prosecution also received a copy of the letter. In the letter, Vercler wrote that he thought defendant was innocent, and that he had resisted a guilty verdict for as long as he could, but when two other jurors collapsed he too capitulated and voted guilty.

Defendant maintains that Vercler's unsolicited letter, postmarked nine days after the verdict, and his testimony at the evidentiary hearing on defendant's motion for acquittal or a new trial, impeached the jury verdict. Defendant argues that he is entitled to a new trial, because Vercler's letter and testimony conclusively show that he was deprived of his right to a unanimous verdict by a fair and impartial jury. The State argues that the trial court did not err in refusing, after the evidentiary hearing, to set aside the unanimous verdict.

The trial court held an evidentiary hearing on June 27, 1986. Vercler testified at this hearing, as did Barbara Harston, another member of defendant's jury.

Vercler testified that everyone knew who was voting guilty and who was not, and the jury had thoroughly discussed the evidence. He said that he had presented his theory to the other jurors but had failed to sway any votes. He said that when two other jurors switched their votes to guilty, a situation developed where "[he] felt the pressure of 11 [other] people all saying you know we are the jury and we have decided what we are going to do. Now it is just a question of wrapping it up so we can go home, so come on and vote guilty." Vercler stated, however, that there was no force or coercion or "anything like that," and that he only voted guilty because "[e]verybody said we have now decided what we are going to do and we are the majority." He also testified that at the time he voted guilty he maintained a reasonable doubt of defendant's guilt and "felt somebody else did it," and he "had no idea of going back to the court and asking it to change his signature."

Juror Harston testified that the jury went "into the courtroom to use the model [of the prison] and at some point as we were going over things, [Vercler] said, 'I will go along with the rest of you and vote guilty.' [O]ne of the [other jurors] said 'no, that is not what we want. We will go over the evidence once more. We want you to be sure, in your own mind, before you vote guilty.' " Harston testified that it was another half an hour or 45 minutes before Vercler agreed that the defendant was guilty.

It is a well-settled principle that a jury's verdict may not be impeached by the testimony or affidavit of a juror which shows the motive, method or process by which that verdict was reached. (See *Chalmers v. City of Chicago* (1982), 88 Ill. 2d 532, 537; *Tanner v. United States* (1987), 483 U.S. 107, 116-27, 97 L. Ed. 2d 90, 103-11,

107 S. Ct. 2739, 2745-51.) Vercler's letter and testimony go to the very heart of the jury system. This is not a matter which courts take lightly. (See *Tanner*, 483 U.S. at 121-25, 97 L. Ed. 2d at 106-09, 107 S. Ct. at 2748-50; *People v. Holmes* (1978), 69 Ill. 2d 507, 511-16.) It is clear that Vercler was not coerced or intimidated in any manner, and that he was, indeed, persuaded by the evidence that defendant was guilty. Under the facts of this case, we cannot say that the trial court erred in refusing to set aside the jury's unanimous verdict of guilty and, consequently, we do not reach the merits of defendant's remaining contentions relative to this issue.

Having determined that no error was committed during the guilt phase of defendant's trial, we now reach the alleged errors at the sentencing phase. Defendant does not dispute the findings in the first stage of the sentencing hearing as to his eligibility for the death penalty. Defendant does, however, argue that the trial court erred in sentencing him to death.

The first stage of the death penalty hearing was held on June 27, 1986. The trial court found that the defendant had attained the age of 18, in that he was 27 years old at the time of the offense. The court further found that the victim was an inmate of the Department of Corrections. The court also found that the defendant had been convicted of the crimes by a jury in Livingston County. The trial court found defendant eligible for the death penalty and it ordered a presentence report.

The second stage of the sentencing hearing occurred on July 17, 1986. The presentence report had been filed earlier the same day.

Defendant offered evidence in mitigation, which consisted of the testimony of Everlena Watkins, defendant's cousin from Muncie, Indiana. Watkins said that she had helped defendant's father raise defendant after his mother had left the family when defendant was only one

year old. Watkins stated she cared for defendant until he was seven years old, when his father moved the family to Chicago. She said that the defendant would come down and stay with her when school was out and that he helped her around the apartments she owned. She also said that defendant was obedient and never acted badly, she would like defendant to live with her, and she cared for and loved him. Defendant presented no other evidence in mitigation.

After reviewing the evidence in aggravation and mitigation, the trial court found that the necessary aggravating factors existed and that there were no mitigating factors sufficient to preclude the imposition of the death penalty. The trial court then sentenced the defendant to death.

A direct appeal was erroneously taken to the appellate court. (Ill. Const. 1970, art. VI, §4(b); 107 Ill. 2d R. 603.) After an amended appeal was filed in this court, defendant made a post-trial motion in the trial court for a new sentencing hearing. The trial court, however, had been divested of jurisdiction. (*Harrisburg-Raleigh Airport Authority v. Department of Revenue* (1989), 126 Ill. 2d 326, 341.) Defendant then filed, in this court, a motion to remand the cause to the trial court for the limited purpose of deciding a post-trial motion for a new sentencing hearing. This court allowed the motion.

The defendant moved for the appointment of a psychiatrist, access for examination, production of records and a continuance of the hearing. The motion was granted and the State produced 20 pages of medical and psychological reports. An agreed order was entered appointing Dr. Daniel J. Cuneo to conduct a psychological examination to determine defendant's present mental state and defendant's mental state prior to, at the time of, and subsequent to the commission of the offense. The

hearing on the post-trial motion for a new sentence was conducted on April 13, 1987.

Dr. Cuneo testified that he first saw defendant on January 14, 1987, and went through a history and a standard interview, and he checked defendant's "affect or mode" and found it to be depressed. He administered a "quick test," to ascertain defendant's intellectual abilities, the results of which revealed that defendant had a "ninety-six I.Q.," which was within the normal range of intelligence. He also administered a Minnesota Multiphasic Personality Inventory (MMPI) test, a 566 true-false question profile used to determine if someone is "malingering."

Dr. Cuneo said that the defendant had told him that he had twice sought psychiatric assistance. He also said that defendant was seen by Dr. Robling on November 1, 1985, who diagnosed him as having a major depression, and was seen by Dr. Ali on January 22, 1986, who had reported that defendant had no signs of depression or psychosis. Dr. Kruglik had also reported that defendant was not psychotic when he examined defendant on January 2, 1986. Dr. Cuneo also stated that defendant had told him he had been stabbed just prior to the murder and that, while defendant downplayed the incident, he would have liked to have seen the extent of the stabbing and the wounds. The medical report of this incident, however, was not in the materials sent to him by the State's Attorney.

Dr. Cuneo also testified about defendant's MMPI score, the results of which were consistent with someone who had extreme irritability, hostility and tension, with depression and insomnia accompanying these states of agitation. He said it would also appear that there was severe alcoholism and/or drug abuse appearing symptomatic of strong regressive oral stirrings, a "real strong"

dependency and paranoid trends with possible deviant sexual orientation.

Dr. Cuneo used the Diagnostic and Statistical Manual Number 3 (DSM—3) in formulating his diagnosis of defendant. He had no diagnosis on Axis Three, and his diagnosis on Axis One was mixed substance abuse in remission due to incarceration.

On Axis Two, Dr. Cuneo said that defendant had clear antisocial personality trends, and that his principal diagnosis would be a paranoid personality disorder; and that only 3% of the present population exhibit this disorder, and not everyone in prison had a paranoid personality disorder. He added that defendant's MMPI profile was consistent with a diagnosis of paranoid personality disorder, that defendant was not a malingerer; rather, he would prefer to be executed than to be labeled mentally ill, as that would be a sign of being weak.

Dr. Cuneo was asked his opinion regarding defendant's mental state at the time of the offense. He said that the paranoid personality disorder was the correct diagnosis but he had some difficulty with the severity of the disorder at the time of the offense, because defendant denied committing the murder, and was saying that he existed in a neutral zone, where no one could cause him problems. His experience with inmates was that there could be no neutral zone. In light of these problems, he said that in order to give his opinion he would need a hypothetical question.

Defense counsel then presented Dr. Cuneo a hypothetical question as to whether defendant was acting under an extreme mental or emotional disturbance at the time of the commission of the offense. This hypothetical assumed the theory of the State's case: there was a meeting at which defendant was ordered to commit the murder and defendant committed the murder. The hypothetical added the fact that the defendant had recently

been attacked and stabbed by the gang. Given this set of facts, Dr. Cuneo opined that defendant "would have been under extreme mental and emotional disturbance."

Asked to assume the same set of facts as to whether defendant would have been acting under the compulsion of threat or menace of imminent infliction of death or great bodily harm, Dr. Cuneo opined that defendant would have been acting under compulsion and under threat.

After giving his opinion, at defendant's request, and with no objection from the State, Dr. Cuneo examined the defendant and saw the stab wounds and scars from the gang attack on defendant. Dr. Cuneo also reviewed the medical records of that stabbing incident. Following the resumption of the hearing and in response to the same defense hypothetical, Dr. Cuneo reaffirmed his opinion that defendant would be acting under an extreme mental or emotional disturbance at the time of the offense.

Upon examination by the State, Dr. Cuneo stated that the first time defendant sought psychiatric help at age 15 was in an attempt to get out of the dormitory in which he was staying. He said that another suicide attempt, where the defendant started a mattress on fire, was also aimed at getting out of whatever dormitory he was in at that time.

Dr. Cuneo also stated that Dr. Kruglik had examined the defendant on January 2, 1986, when defendant complained that he did not want to be housed in "E" unit. He said that Dr. Kruglik's report concluded that defendant was neither an aggressive person nor a psychotic. He also said that defendant had been manipulating events in his two suicide attempts to gain some benefit; but he added that those incidents would not be symptomatic of a paranoid personality disorder.

Dr. Cuneo said that he had relied on the analyses of Drs. Kruglik, Ali, and Robling in forming his diagnosis, and admitted that none of those doctors had diagnosed defendant as having a paranoid personality disorder. His analysis relied in part upon the answers defendant gave him, but that fact did not affect the certainty of the paranoid personality disorder diagnosis, because the defendant "fits the criteria for the diagnosis, and the denial does not even come into play."

On further examination by the State, Dr. Cuneo was asked what effect defendant's denial had on his diagnosis. He replied that regardless, "I've got an individual with a paranoid personality disorder," and the denial would only affect the severity of the disorder.

Dr. Cuneo then went through two scenarios: defendant's denial of the crimes, and his conviction for the crimes. He stated that assuming there was no meeting, and defendant was existing in a neutral zone, there would have been some emotional duress, but not rising to an extreme level. He also said that if he believed the defendant then there would be no emotional duress, because defendant said there was none. Dr. Cuneo said that, insofar as defendant was convicted, he would have to assume that a "hit was going down," and since defendant had been recently stabbed, defendant would have been under emotional duress and would be acting under emotional distress, extreme paranoia, fear of retaliation, duress and compulsion at the time the murder was committed.

Following closing arguments, the court began its ruling. The trial court stated the question was whether either compulsion or extreme mental or emotional disturbance existed as defined in the Illinois death penalty statute (Ill. Rev. Stat. 1983, ch. 38, pars. 9—1(c)(2), (c)(4)). The trial court reviewed Dr. Cuneo's testimony and found nothing from either "Axis One" or "Axis

Three" to be helpful, stating "defendant's case must rise and fall with respect to the diagnosis on Axis Two."

The trial court said that when Dr. Cuneo rendered his opinion that it was a paranoid personality disorder that was influencing defendant at the time of the offense, he based his opinion on two events defendant denied—that he committed the offense and that he met with gang leaders before the murder. The trial court said that Dr. Cuneo believed this was the "weakest link" in his testimony, that this was the type of evidence about which Dr. Cuneo was most unsure, and yet Dr. Cuneo was certain as to his diagnosis of the paranoid personality disorder.

The trial court went on to state:

> "It seems to me that when he characterizes this testimony as the weakest portion of his testimony, that that is certainly true, and it also seems to me that based upon my observations of numerous inmates who have been before this Court from the penitentiary charged with various offenses that they all to a certain extent suffer from this type of, of—they all evidence this, this same type of guardedness that the Doctor says characterize—characterizes a paranoid personality disorder. ***
>
> And to that extent, it seems to me that Mr. Boclair is no different than any number of other people who are incarcerated in the penitentiary. ***
>
> So I'm not persuaded that this is a mitigating factor such as would preclude the imposition of the death penalty."

Following this finding the court went on to address whether defendant had acted under compulsion of threat or menace of imminent infliction of death or great bodily harm. The trial court found that defendant had alternatives available to him other than participating in the murder, in that he could have told a correctional officer and sought protective custody. The trial court also found that this was not a mitigating factor sufficient to preclude the imposition of the death penalty.

Defendant raises three arguments: the trial court erred in speculating about his future dangerousness in prison; the overwhelming weight of mitigating evidence rendered the death penalty an inappropriate sentence; and the trial court rejected unrebutted expert testimony regarding the presence of two statutory mitigating factors. The State asserts that the death penalty was properly imposed because of the circumstances of the offense and the character of the defendant. The State also contends that at the hearing, on defendant's motion for a new sentencing hearing, the trial court properly weighed the evidence in mitigation and aggravation, and in that weighing process the judge took into account the expert's opinion as well as the defendant's character.

The purpose of the aggravation and mitigation phase of the sentencing hearing is to insure that the discretion of the sentencing authority is exercised in an informed manner, based upon the evidence at hand and not on extraneous influences; on reason not caprice. *People v. Orange* (1988), 121 Ill. 2d 364, 391; *People v. Devin* (1982), 93 Ill. 2d 326, 345-46; *People v. Gleckler* (1980), 82 Ill. 2d 145, 162.

In mitigation, defendant presented the unrebutted testimony of Dr. Cuneo. The credibility and weight to be given to this testimony are for the trier of fact. (*People v. Wright* (1985), 111 Ill. 2d 128, 154.) The ultimate question of whether or not the death penalty is the appropriate sentence is an issue for the trial court, not the expert.

We agree with the trial court that the defendant was not acting under compulsion of threat or menace. As the trial court noted, the defendant had alternatives open to him other than participating in the murder.

We do, however, disagree with the trial court's finding as to Dr. Cuneo's testimony regarding defendant's mental state at the time of the commission of the of-

fense. From our review of the record, the trial court misunderstood Dr. Cuneo's testimony. The trial court found that Dr. Cuneo's opinion relied upon two things which defendant denied—the commission of the offense and meeting with gang leaders. This was incorrect.

Dr. Cuneo gave his opinion in response to a hypothetical question which assumed the theory of the State's case, and the facts which defendant denied: defendant attended a meeting with gang leaders at which he was ordered to make the "hit," defendant committed the murder, and added the fact that the defendant had been recently attacked and stabbed by the gang. Dr. Cuneo's opinion was that, under these facts, defendant would have been acting under an extreme mental or emotional disturbance at the time of the commission of the offense.

Also, under the trial court's standard any prisoner appearing before this trial judge who suffers from a paranoid personality disorder would be unable to plead or prove an extreme mental or emotional disturbance, because in the trial judge's opinion, all "inmates who have been before [him] suffer" from "a paranoid personality disorder." The trial court's statement demonstrates a prejudice against incarcerated defendants, rather than a reasoned and informed judgment based upon the evidence contained in the record.

Additionally, a defendant is entitled to individualized sentencing treatment. (*Lockett v. Ohio* (1978), 438 U.S. 586, 605, 57 L. Ed. 2d 973, 990, 98 S. Ct. 2954, 2965; *Woodson v. North Carolina* (1976), 428 U.S. 280, 304, 49 L. Ed. 2d 944, 961, 96 S. Ct. 2978, 2991; *People v. La Pointe* (1981), 88 Ill. 2d 482, 494-96.) This court has also stressed the importance of excluding extraneous and irrelevant influences from consideration at a death penalty hearing. *People v. Devin* (1982), 93 Ill. 2d 326, 346.

Here, the trial court "believe[d]" Dr. Cuneo's diagnosis, that defendant had a paranoid personality disorder,

was correct, but then failed to consider that testimony in light of the individual circumstances of the defendant then appearing before him. The trial judge reasoned that in his experience all of the inmates who had appeared before him could be classified as having paranoid personalities. Significantly, the trial court's belief was at odds with the unrebutted expert evidence that not all prisoners have paranoid personality disorders. Nevertheless, the trial court relied upon its irrelevant and unsupported assertion to deny defendant's motion for a new sentence, thus affirming the death sentence. The trial judge's comparison was not an appropriate consideration nor did it insure "[r]ationality, consistency, and evenhandedness in the imposition of the death penalty." *People v. Szabo* (1983), 94 Ill. 2d 327, 352-53.

The trial court abused its discretion by failing to consider the defendant's mitigating evidence as well by denying the defendant the individual sentencing treatment to which he is entitled. Accordingly, we must vacate the death sentence and remand the cause to the trial court for a new sentencing hearing. Therefore, we need not address defendant's constitutional challenges to the Illinois death penalty statute.

For the foregoing reasons, the judgment of the circuit court of Livingston County is affirmed in part and vacated in part, and the cause is remanded for a new sentencing hearing.

JUSTICE RYAN, dissenting:

The majority opinion finds that "[t]he trial court's statement demonstrates a prejudice against incarcerated defendants, rather than a reasoned and informed judgment based upon the evidence contained in the record." (129 Ill. 2d at 494.) I do not agree with the opinion's as-

sessment of the trial judge's statement. Things have been read into the judge's comment that cannot reasonably be deducted from what was said. Not only do I think the above inference is wrong, but also, as demonstrated below, other conclusions were drawn with which I do not agree.

I do not think that the trial judge's statement demonstrates a prejudice against incarcerated defendants. Also, I do not agree with the conclusion in the majority opinion that the statement of the judge implies that he reasoned "that in his experience all of the inmates who [have been] before him could be classified as having paranoid personalities." (129 Ill. 2d at 495.) The statement from which the opinion draws these erroneous conclusions was made by the court in evaluating Dr. Cuneo's opinion that the defendant had a paranoid personality disorder that was influencing him at the time of the offense. The judge's statement set forth the reasons that he did not give great weight to Dr. Cuneo's opinion. The judge's statement referred to testimony of Dr. Cuneo that the defendant displayed a certain guardedness which the doctor said characterizes a paranoid personality disorder. The judge noted that based upon his observation of numerous inmates who had appeared before him, they all, *to a certain extent,* evidenced this same type of guardedness. The trial court then concluded that the testimony of Dr. Cuneo did not establish a mitigating factor which would preclude the imposition of the death penalty.

In my opinion, the trial judge did not demonstrate a prejudice against incarcerated defendants. For the judge to say that all inmates who appeared before him, *to a certain extent,* evidenced the same type of guardedness, which the doctor says characterizes a paranoid personality disorder, is simply an observation by the trial judge as to why he did not give much weight to the doctor's

opinion. It does not demonstrate a prejudice against incarcerated defendants. It does not show that the judge reasoned that all inmates who have appeared before him could be classified as having paranoid personalities. These are just erroneous conclusions which this court has drawn from the judge's statement. The judge simply stated that all of the inmates who appeared before him, *to a certain extent*, demonstrated the characteristics which the doctor considered significant.

The opinion states that the credibility and weight to be given to Dr. Cuneo's testimony are for the trier of fact. Yet the opinion rejected the trial judge's evaluation of Dr. Cuneo's testimony because of the erroneous conclusions drawn from the trial judge's statement made during the evaluation of that testimony. I think that the erroneous conclusions drawn by this court are unfair to the trial judge. I think the finding, judgment and sentence of the trial court should be affirmed. I, therefore, dissent.

JUSTICE STAMOS joins in this dissent.