THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
DANIEL ZURAWSKI, Defendant-Appellant.

Second District   No. 2—90—1106

Opinion filed September 10, 1992.

420

Herbert Abrams, of Law Offices of Abrams & Minkus, of Skokie, for appellant.

James E. Ryan, State's Attorney, of Wheaton (William L. Browers and Robert J. Biderman, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE INGLIS delivered the opinion of the court:

Defendant, Daniel Zurawski, was convicted by a jury of two counts of possession of a controlled substance with the intent to deliver in violation of sections 401(a)(2) and 401(b)(2) of the Controlled Substances Act (Ill. Rev. Stat. 1987, ch. 56½, pars. 1401(a)(2), (b)(2)). He was sentenced to six years' imprisonment and fined $6,600 for violation of section 401(a)(2) (the quantity of cocaine being more than 15 grams, a Class X felony), and sentenced to four concurrent years' imprisonment and fined $900 for violation of section 401(b)(2) (the quantity of cocaine being between 1 and 15 grams, a Class 1 felony). Defendant raises five issues on appeal: (1) whether the trial court erred in denying defendant's motion to quash the arrest and suppress evidence; (2) whether defendant was proven guilty beyond a reasonable doubt; (3) whether the trial court erred in denying defendant's motion for a mistrial; (4) whether the trial court erred in denying defendant's motion for a new trial; and (5) whether defendant was improperly indicted by the Du Page County grand jury. We affirm.

Defendant was arrested on October 21, 1988, while in the garage of Louis Napoleon in Addison, Illinois. According to defendant, he visited Napoleon that evening to pick up his 1981 Cadillac, which had been parked in front of Napoleon's home while defendant was on vacation. As the result of two undercover cocaine purchases from Napoleon, the Addison police department executed an arrest

warrant for Napoleon and a search warrant for Napoleon's garage at approximately 9 p.m. that evening. The officers found defendant in the garage talking with Napoleon.

Both men were told to lie on the floor and then were handcuffed. Three $100 bills, of which the serial numbers had been previously recorded by the police, were found in defendant's pants' pockets. Those three bills were used when a police informant purchased drugs from Napoleon earlier that evening. A search of Napoleon's garage revealed a secure back room where the police found and seized approximately 80 grams of cocaine, a scale and other drug paraphernalia. Defendant and Napoleon were then arrested, taken to the police station and read *Miranda* warnings. The police also towed defendant's car to the police station. After obtaining a search warrant approximately eight hours later, the police searched the car and found three packets of cocaine, weighing approximately 7½ grams, in the passenger area.

Defendant was charged in count I with violating section 401(b)(2) of the Act (Ill. Rev. Stat. 1987, ch. 56½, par. 1401(b)(2)), based on the cocaine found in his car. Defendant was charged in count II with violating section 401(a)(2) of the Act (Ill. Rev. Stat. 1987, ch. 56½, par. 1401(a)(2)), based on the cocaine found in Napoleon's garage.

Defendant filed a motion to suppress evidence, alleging that the police searched him, and towed and searched his car, without legal cause. After a suppression hearing on March 13, 1989, the trial judge denied defendant's motion. Defendant's trial was in January 1990. At one point during the testimony of one of the police officers, defendant moved for a mistrial because the officer testified that defendant had denied the officer permission to search his car. The trial judge denied the motion. The jury found defendant guilty of both counts. In September 1990, the trial judge heard defendant's motion for a new trial. Defendant alleged newly discovered evidence as a basis for his motion. After a hearing, the trial judge denied the motion and sentenced defendant.

### MOTION TO SUPPRESS HEARING

Officer Michael Simo, Lieutenant Michael Kostecki and the police informant testified at the March 13, 1989, suppression hearing.

Officer Simo testified that he arranged for the police informant to purchase cocaine from Napoleon on October 20, 1988. The informant purchased a small envelope containing 3½ grams for $150. He told Simo that Napoleon had a sawed-off shotgun in the locked

back room to the garage where he purchased the drugs. He indicated that Napoleon kept the back room locked at all times, even to family members.

The informant also told Simo that he thought he knew who Napoleon's supplier was. He did not know this individual's name, but described him as a white male, in his late thirties, with light colored hair, a medium build, 6 feet tall, whose last name is Polish and starts with the letter "Z," and who is known as Dan, Mr. Z and Danny Z. The informant told Simo that he saw this individual deliver drugs to Napoleon at least six times in the past. He also said that this individual drove a black Eldorado Cadillac, with Illinois license plates that read "M-R-Z-E-E." Simo had never used this particular informant before. The informant knew of Napoleon's drug activity because he used to be a "runner" for Napoleon, making drug deliveries, and because he used to buy drugs from Napoleon for personal use.

Officer Simo testified that there had not been an agreement regarding the informant's participation in this case and that the informant was not paid for his participation. However, a month or two later, the informant's two-week sentence on a misdemeanor retail theft charge was waived.

Officer Simo arranged for the informant to make a second drug purchase from Napoleon on October 21 at approximately 6 p.m. The informant purchased a small envelope containing a quarter-ounce of cocaine, approximately seven grams, for $400. He used four $100 bills, the serial numbers of which had been recorded. The amount purchased tested positive for cocaine.

Simo then obtained a search warrant for the garage, which he and four other Addison police officers executed at 9 p.m. that evening. They approached the east door to the garage, knocked and loudly announced their presence, to which there was no response. They then checked the door and found that it was locked. Two officers used a battering ram to open the locked door. Defendant and Napoleon were found in the back room of the garage, were instructed to lie down on the floor, remained standing, and were then forced onto the floor and handcuffed. Within the back room, Simo stated that they found two clear plastic bags half full of a white powdery substance, a triple-beam scale and 16 envelopes, similar to the envelopes that the informant had purchased earlier that day and the day before.

Officer Simo stated that Lieutenant Kostecki searched defendant and found three $100 bills in his pants' pockets, the serial num-

bers of which matched those of three of the bills that the informant had used earlier that day to buy cocaine from Napoleon. Simo stated that the fourth bill never turned up in the search of the garage. According to Simo, the police did not know who defendant was until about 15 minutes after the search began, at which point they ran a license plate check on a black Eldorado Cadillac parked out front with a license plate that read "MRZEE1." They learned that a "Dan Zurawski," defendant, was the owner of the car. Simo testified that the Cadillac was not parked in front of Napoleon's home on either of the two occasions when the informant had purchased cocaine from Napoleon. Defendant was arrested, taken to the Addison police station, and read the *Miranda* warning.

Officer Simo testified that defendant's car was towed to the police station at 9:45 p.m. that evening to secure it until the police obtained a search warrant. Due to the circumstances, Simo suspected that cocaine would be found in the car. After obtaining a search warrant for the car the following day, Simo stated that other officers searched the car and found three packages of cocaine in the passenger area.

The police informant was the next witness. He testified that he met Napoleon in December 1987. The informant purchased cocaine from Napoleon approximately 100 times between January and July 1988, during which time the informant was using cocaine regularly. He stated that he has been arrested for theft twice. For the felony theft, he was sentenced to three years' probation. For the misdemeanor theft, his two-week jail sentence was waived after the Addison police department relayed his cooperation in this case to the State's Attorney's office.

The informant's testimony regarding the drug purchases from Napoleon on October 20 and 21 matched that of Officer Simo. He stated that he told the police about defendant's drug transactions with Napoleon, described defendant's physical description, related his various nicknames, and described defendant's Eldorado Cadillac and specialized license plate. The informant testified that he saw defendant with Napoleon six times previously, each time at Napoleon's garage. Each time, defendant would carry a shoe box and accompany Napoleon to the back room of the garage. When the two men exited the back room, the informant would hear Napoleon say "add that to my account." The informant testified that for one transaction he went to defendant's condominium in Roselle with Napoleon and saw cocaine packets pass from defendant to Napo-

leon. He did not actually see the cocaine change hands at any of the other times.

Lieutenant Michael Kostecki testified next. Kostecki stated that upon arrival at Napoleon's garage at 9 p.m. on October 20, the officers knocked on the door, twice announced their presence, heard no response, after which they forced the door open with a battering ram. Kostecki stated that he searched defendant and found a roll of bills in defendant's left front pants' pocket. The roll consisted of five $100 bills, some $20 bills and some smaller bills. Kostecki stated that three of the $100 bills matched the previously recorded serial numbers of the $100 bills used by the informant when he purchased cocaine from Napoleon earlier that evening.

Kostecki testified that while he recalled seeing a black Eldorado Cadillac parked in front of Napoleon's home prior to executing the garage search warrant, he did not note the car's license plate. Regarding the sequence of when defendant was searched and when the police learned who he was and how he was connected to the circumstances, Kostecki testified that after he finished searching defendant, Officer Simo informed him that defendant was apparently the "Mr. Z" that the informant had described and that the car in front of Napoleon's home was the car that the informant had described as being owned by "Mr. Z."

Kostecki testified that at approximately 4 a.m. on October 22, after the automobile search warrant was obtained, he and Sergeant Gorniak searched defendant's car. Kostecki stated that Gorniak found drugs on the back of the front seat.

The trial judge, defendant's attorney and the State's attorney then engaged in a spirited discussion over defendant's motion to suppress. The trial judge signed an order later that day, March 13, 1990, finding probable cause to seize and search defendant's car. However, the trial judge withheld judgment on whether the police had probable cause to search defendant until the State presented him with supporting case law. Two weeks later, defendant filed a motion to reconsider. Thereafter, the State filed a response to defendant's motion which contained supporting case law that the trial judge had requested. On May 17, the trial judge heard arguments on defendant's motion for reconsideration. The trial judge concluded that under all the circumstances the police had probable cause to search defendant since it is reasonable to believe that he was involved in the delivery of cocaine. Even if no probable cause existed at that particular time, the trial judge concluded that the $300, which defendant sought to suppress, would have been inevita-

bly discovered. Before the police would have theoretically released defendant, they would have taken time to finish their search of the garage during which time they would have learned defendant's identity and searched him. An order dated May 17, 1989, summarized these conclusions by finding "probable cause to arrest defendant and seize [his] vehicle."

#### WAS MOTION TO QUASH ARREST AND SUPPRESS EVIDENCE IMPROPERLY DENIED?

At issue is whether the trial court erred by denying defendant's motion to quash his arrest and suppress evidence. Defendant argues that the trial court erred for four reasons: (1) he was arrested without a warrant and without probable cause; (2) the police had no right to conduct a full search of his person; (3) the police illegally seized and towed defendant's 1981 Cadillac without first obtaining a warrant; and (4) the police affidavit in support of a request for a warrant to search defendant's car was fatally flawed because Officer Simo failed to include information concerning the informant's criminal background and previous drug use.

The State responds that the police had probable cause and the right to make a full search of defendant pursuant to section 108—9 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1989, ch. 38, par. 108—9). The State argues that the police had the right to seize and tow defendant's car pursuant to *People v. Wetherbe* (1984), 122 Ill. App. 3d 654. The State finally contends that any information omitted from the police affidavit is inconsequential because such information would not have destroyed probable cause, citing *People v. Strong* (1986), 151 Ill. App. 3d 28.

A trial court's decision on a motion to suppress will not be overturned on review unless that decision is clearly erroneous. (*People v. Galvin* (1989), 127 Ill. 2d 153, 162; *People v. Simmons* (1991), 210 Ill. App. 3d 692, 696.) We will initially address defendant's custodial arrest and subsequent search and then address the seizure and subsequent search of his car.

In *People v. Gutierrez* (1985), 109 Ill. 2d 59, our supreme court analyzed a similar situation. Following an undercover purchase of cocaine from a woman at a house in Chicago, the police executed a search warrant on the premises later that night. A police officer knocked on the front door, and Frank Gutierrez, defendant in the case, answered the door. Gutierrez appeared nervous and attempted to close the door. The woman who had earlier sold cocaine to the undercover officer was searched. Cocaine was found on her person

and she was arrested. A police officer observed that Gutierrez was "agitated and walking about nervously." (109 Ill. 2d at 61.) The officer noticed bulges in Gutierrez's pants' pockets and asked him to empty his pockets. Gutierrez removed two balloons of heroin. (*Gutierrez*, 109 Ill. 2d at 61.) The supreme court held that such a search was not violative of the fourth amendment, based in part on exigent circumstances:

> "[T]here were exigent circumstances which made obtaining another search warrant impracticable. It was late at night. The purpose of the warrant that had been obtained was to uncover controlled substances then on the premises. The warrant was obtained soon after an officer had made the cocaine purchase. Considering all of the circumstances, there was probable cause to believe that the defendant was concealing controlled substances and that search of the defendant should be made in order to preserve evidence. As this court stated in *People v. Campbell* (1977), 67 Ill. 2d 308, 319, '[t]he ultimate test, of course, is the reasonableness of the search which was made, not whether the officers could have secured a warrant.' The search of the defendant was not unreasonable and unconstitutional." (*Gutierrez*, 109 Ill. 2d at 63-64.)

The court also distinguished *Ybarra v. Illinois* (1979), 444 U.S. 85, 62 L. Ed. 2d 238, 100 S. Ct. 338, by finding that the police had particularized suspicion to search Gutierrez. *Gutierrez*, 109 Ill. 2d at 64.

■ We believe that a similar analysis applies to the instant case. There were exigent circumstances that made it impracticable for the Addison police officers to obtain an additional search warrant. The purpose of the original search warrant, obtained hours after the informant's second controlled purchase, was to uncover cocaine in Napoleon's garage. Considering all of the circumstances—the informant's description of the back room to Napoleon's garage as being the room for drug transactions, and the need to use a battering ram to open the dead-bolted garage door—known to the police at the time, there was probable cause to believe that defendant was involved in a drug transaction with Napoleon. The police had probable cause to believe that defendant was concealing controlled substances and that an immediate search of defendant should be made in order to preserve evidence. Under these circumstances, we conclude that the search of defendant was not unreasonable or unconstitutional.

In the alternative, even if the immediate search of defendant was unreasonable, we agree with the trial court's reasoning that, at a minimum, the police had a right to detain defendant until the garage search was completed (see Ill. Rev. Stat. 1989, ch. 38, par. 108—9) during which time they would have gained the particularized suspicion to search defendant. The marked $100 bills, which defendant sought to have suppressed, would therefore have been inevitably discovered. The "inevitable discovery doctrine" was developed as an exception to the exclusionary rule, which requires the exclusion of illegally obtained evidence at a criminal trial. (*People v. Edwards* (1991), 144 Ill. 2d 108, 143; *People v. Winsett* (1991), 222 Ill. App. 3d 58, 69.) Under the doctrine, "evidence obtained in violation of an accused's constitutional rights and which otherwise would be inadmissible at trial may be admitted if the prosecution is able to show that the evidence 'would inevitably have been discovered without reference to the police error or misconduct.'" (*Edwards*, 144 Ill. 2d at 142, quoting *Nix v. Williams* (1984), 467 U.S. 431, 448, 81 L. Ed. 2d 377, 390, 104 S. Ct. 2501, 2511.) Discounting the immediate search of defendant entirely, we conclude that the police would have developed particularized suspicion to search defendant while he was detained. Officer Simo would have discovered how closely defendant matched the informant's description of Napoleon's supplier and how closely a black Eldorado Cadillac parked in front of Napoleon's home matched the informant's description of the supplier's car. The police would have at that point had probable cause to search defendant for drugs or other contraband. The three marked $100 bills would therefore have been inevitably discovered.

Turning to the seizure and subsequent search of defendant's car, the fourth amendment's prohibition against unreasonable searches and seizures mandates that a warrant be obtained before a car may be searched, unless the search was made with consent, upon probable cause to believe that the vehicle was used in or contains evidence of a crime, as incident to arrest, or after lawful impoundment of the car. *People v. Bujdud* (1988), 177 Ill. App. 3d 396, 403; *People v. Wetherbe* (1984), 122 Ill. App. 3d 654, 656.

■ We believe that based on our conclusion that the police had probable cause to immediately search defendant upon discovering him in the back room of the garage with Napoleon, or that they would have developed probable cause to search defendant while they detained him, the police also had probable cause to believe that defendant's car contained drugs. Since the informant's description

of Napoleon's supplier and his car matched that of defendant and his car, it was highly probable that the car contained drugs. We conclude that the police had probable cause to immediately search defendant's car, even though they actually searched the car eight hours later after towing the car to the police station and securing a search warrant for the car from a judge. Having so concluded, we need not address defendant's contention that the automobile search warrant was invalid.

### DEFENDANT'S TRIAL

Nine witnesses testified at defendant's three-day trial in January 1990: the police informant, Louis Napoleon, Kathy Napoleon, Officer Simo, Lieutenant Kostecki, Sergeant Gorniak, Nick McNamara (by stipulation), Edward Christophersen and Martin Holtzman.

The informant's trial testimony paralleled the testimony that he had given at the earlier motion to suppress hearing. He testified that he first approached Officer Simo after work on October 20, 1988, to offer his help investigating Napoleon, who the informant thought was a large cocaine dealer. The informant knew Simo since Simo was the arresting officer when he was arrested for misdemeanor theft.

The informant testified as to the controlled purchases of cocaine from Napoleon, the first on October 20 and the second on October 21. The informant stated that he knew defendant and that defendant owned a black Eldorado Cadillac, but that the car was not parked in front of Napoleon's home on October 21 when he bought cocaine from Napoleon. The informant admitted that he had sold, purchased, and used cocaine and other drugs in the past, but claimed that he was not now using drugs. The informant testified that he accompanied Napoleon on one trip to defendant's home on Roselle Road in Schaumburg and witnessed defendant giving cocaine to Napoleon. The informant stated this trip occurred on or around July 8, 1988.

Louis Napoleon testified next. Napoleon stated that he pleaded guilty to possession of a controlled substance with intent to deliver and delivery of a controlled substance. The plea agreement entailed 30 days in jail, 12 months on work release, and a $15,000 fine. Napoleon also agreed to testify truthfully at defendant's trial.

Napoleon testified that defendant, whom he has known for about 10 years, was his cocaine supplier. Napoleon stated that he had been selling drugs out of the back room of his garage for about

one year. He was the only person who had access to the back room. Defendant would sell drugs to Napoleon in that back room. Payment was in cash; however, defendant often left cocaine with Napoleon with full payment expected later.

Napoleon's testimony concerning the informant's October 20 and October 21 purchases of cocaine from him paralleled the testimony given by Officer Simo and the informant at the earlier suppression hearing. The informant purchased an eighth of an ounce for $150 on October 20 and a quarter of an ounce for $400 on October 21.

Napoleon then described the circumstances of the evening of October 21. After the informant made his purchase at around 6 p.m., Napoleon went to the store and the bank to prepare for a card game he was hosting at his home later that evening. The trip lasted 30 to 45 minutes. Defendant came over to Napoleon's house at around 8:15 p.m. or 8:30 p.m. Napoleon stated that prior to this time defendant's black Eldorado Cadillac was not parked on the street in front of Napoleon's home. Defendant knocked on the kitchen door and Napoleon let him in. Defendant set his car keys down on the kitchen counter, and they both went to the garage. After they were inside the garage, Napoleon fastened the dead-bolt lock on the door. Defendant then gave Napoleon three ounces of cocaine at an agreed price of $850 an ounce. Napoleon did not pay defendant the entire amount due, instead paying him $500 cash in "large bills, fifties or hundreds." Napoleon stated that he and defendant were in the back room for 10 to 20 minutes when the police executed the search warrant.

The State introduced various items of drug paraphernalia into evidence during Napoleon's testimony, including a triple-beam scale, a grinder, a police scanner, a calculator, little brown envelopes, straws, and a notebook in which Napoleon recorded his drug transactions. Napoleon said that entries in the notebook next to the name "[K]" were those of the police informant and that entries next to the name "Dan" were those of defendant. The number "5220" was next to one entry with defendant's scrawled initials and the date "10/21/88" next to it, which Napoleon indicated meant how much he owed defendant after that evening's transaction. Above the number "5220" was a scratched out number which read "5720," which Napoleon explained was the amount he owed defendant before he paid defendant $500 that evening. Napoleon denied owning a .22 caliber rifle.

Napoleon testified that the informant accompanied him to defendant's condominium in Schaumburg sometime before his trip to Italy in July 1988. Napoleon denied receiving cocaine from defendant on that particular evening.

Officer Simo testified next. His trial testimony paralleled the testimony he had given at the earlier suppression hearing. The informant, whom he had earlier arrested on a misdemeanor theft charge, called Simo on October 20. Simo then arranged for the informant to make two purchases of cocaine from Napoleon, one that evening and the second on the evening of October 21. Simo testified that he "field tested" both purchases and that both tested positive for cocaine. He accompanied the informant both times, concealing himself in the backseat of the informant's car. Each time, the informant would park the car on the street and then Simo would observe him as he walked to the side entrance of the garage. Simo did not see defendant's car parked in front of Napoleon's home on either occasion. After the October 21 purchase, the informant told Simo that he saw three small packets of cocaine in a garbage can near the workbench in the back room of Napoleon's garage. Simo testified that these three packets were found during the search of the garage in a white K mart plastic bag in the garbage can by the workbench. He also identified the various drug paraphernalia items which were recovered from the back room of Napoleon's garage. The contents of the two plastic baggies recovered from the back room, a white powdery substance weighing approximately 90 grams, tested positive for cocaine.

Towards the end of Officer Simo's testimony, the following colloquy occurred:

"Q. [Prosecutor]: When Mr. Abrams asked you some questions about when you asked the defendant for his car keys, did the defendant during that time ever tell you to ask [Napoleon] for the car keys or [if Napoleon] had the car keys?

A. [Officer Simo]: No, he didn't.

Q. He just said he didn't know where they were?

A. That's correct.

Q. Did you ask him anything else about his car after you asked him for his car keys?

A. I asked him for permission to search it.

Q. What happened after that?

A. He said no.

MR. ABRAMS [Defendant's attorney]: I am going to make an objection and ask for a mistrial at this time."

The trial judge heard arguments on the motion in chambers. Defense counsel argued that Simo's last answer, "[h]e said no," was hearsay, that no hearsay exception applied, and that it was prejudicial because it let the jury think that defendant had something to hide. Defense counsel argued that the only option left for him was to call his client to the stand, which he should not have to do. The trial judge determined that the statement was improperly admitted, even though it was an invited response since defense counsel had earlier questioned Simo on the general area of the car keys. The trial judge also determined that the one statement standing alone was not so prejudicial as to require a mistrial. The judge denied defendant's motion, returned to the courtroom and instructed the jury to disregard the prosecutor's last question and Officer Simo's answer.

During Officer Simo's testimony, the State introduced a mobile telephone that Simo had taken from defendant's car on November 1, 1988. The State also introduced Illinois automobile registration slips for 1985, 1986, 1987 and 1989 that Simo recovered from the car and which identify defendant as the owner.

Lieutenant Kostecki testified next. His testimony regarding the execution of the search warrant at Napoleon's garage on October 21 paralleled his testimony at the earlier suppression hearing. He added that when he searched defendant, he recovered $736.55 in cash. Kostecki testified that three of the five $100 bills that were on defendant had serial numbers matching three of the $100 bills used by the informant to buy cocaine from Napoleon earlier that evening.

Sergeant Thomas Gorniak testified next. He testified as to his role as backup officer for the controlled purchases by the informant from Napoleon, his presence at the time the search warrant on Napoleon's garage was executed, and his execution of a search warrant on defendant's car which yielded three envelopes containing cocaine. Gorniak also testified that while defendant's black Eldorado Cadillac was in front of Napoleon's home at 9 p.m. on October 21, the time the police executed the garage search warrant, the car was not parked there when the informant purchased drugs from Napoleon earlier that evening.

The State offered stipulated testimony from Nick McNamara, a forensic chemist at the Du Page County crime laboratory, who examined and tested certain exhibits that were recovered from Napoleon's garage and defendant's car. McNamara's stipulation stated that the following items tested positive for cocaine: the substances

the informant purchased from Napoleon on October 20 and 21, each weighing about 3½ grams; the two plastic baggies found in the cabinet in the back room of Napoleon's garage, one weighing 55.51 grams and the other weighing 24.98 grams; and the three packets found in defendant's car, the total weight of the three being 7.51 grams.

Defendant's case consisted of testimony from Edward Christophersen and Martin Holtzman. Christophersen, a building contractor, testified that he has known defendant for 8 to 10 years. He stated that on October 19, 1988, he met with defendant at a restaurant-bar near defendant's father's hunting camp, which is located in Menominee on the border between Wisconsin and the Upper Peninsula of Michigan. On that date, defendant met with Christophersen because he wanted an estimate from Christophersen to remodel the kitchen and reroof the bar. Christophersen stated that later that evening he met with defendant and defendant's friend "Marty" at a different bar. Christophersen testified that defendant was not driving a black Eldorado Cadillac at the time.

Martin Holtzman testified that he is an insurance adjuster and that he has known defendant since 1984. Holtzman testified that on Monday, October 17, 1988, he and defendant left together to drive up to Menominee because defendant wanted to look at a restaurant-bar that he was considering for purchase. Holtzman was going to estimate how much insurance defendant would need for the building. They drove in Holtzman's wife's car. When Holtzman picked defendant up on Monday, October 17, at defendant's home, he did not see defendant's car in the parking lot. Holtzman testified that on Friday, October 21, 1988, the two returned from their trip north. Holtzman deposited defendant at Napoleon's home in Addison at around 7 p.m. that evening. Holtzman stated that when he dropped defendant off, he noticed that defendant's car was parked in front of the house immediately next to Napoleon's. Holtzman testified that one week later, after he learned of the events that transpired that evening, he went to Napoleon's home and picked up defendant's keys.

The State presented one rebuttal witness, Kathy Napoleon, who was Louis Napoleon's wife at time of trial. Kathy testified that she was home on October 21, 1988. She stated that a black Eldorado Cadillac was not parked in front of their home that day. She recalled defendant visiting her husband later that evening. Only after the police arrived and arrested her husband did Kathy observe a

black Eldorado Cadillac parked on the street next to the driveway to their home.

WAS DEFENDANT PROVEN GUILTY BEYOND A REASONABLE DOUBT?

Defendant argues that he was not proven guilty of either charge beyond a reasonable doubt because he was not in actual or constructive possession of the cocaine found in the garage or his car, there was "credible evidence" explaining the marked $100 bills found in his pocket, and the State's two primary witnesses were "wholly impeached." The State argues that the evidence supports the jury's verdict.

Our supreme court discussed the parameters of appellate review of a claim of reasonable doubt in *People v. Boclair* (1989), 129 Ill. 2d 458:

"It is the jury's duty to assess the credibility of witnesses and to weigh the evidence in determining a defendant's guilt or innocence. [Citations.] That determination is entitled to great deference, and when the sufficiency of the evidence is challenged we will not retry the defendant, although it is our duty to set aside a conviction when the evidence raises a reasonable doubt of defendant's guilt. [Citations.] *** ' "[T]he relevant question is whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' " (Emphasis in original.) *Boclair*, 129 Ill. 2d at 474, quoting *People v. Collins* (1985), 106 Ill. 2d 237, 261, quoting *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789.

We first consider the charge based on the cocaine found in defendant's car. Under section 401(b)(2) of the Controlled Substances Act (Act), the State had to prove that defendant knowingly delivered, or possessed with the intent to deliver, more than 1 gram but less than 15 grams of cocaine. (Ill. Rev. Stat. 1987, ch. 56½, par. 1401(b)(2).) Possession under the Act may be established by evidence of actual or constructive possession, the latter of which may be proved by showing that defendant controlled the premises where the narcotics were found. *People v. Maiden* (1991), 210 Ill. App. 3d 390, 397.

■ Viewing the evidence in a light most favorable to the State, we note that the State presented evidence that defendant owned the black Eldorado Cadillac, that the car was not parked on the street in front of Napoleon's home when the informant made con-

trolled purchases on October 20 or October 21, that defendant had supplied cocaine to Napoleon in the past, and that three packets of cocaine, weighing 7.51 grams, were found in the car by the police. As defendant points out, there was conflicting evidence as to whether defendant's car was parked in front of Napoleon's home for a longer period of time than just the evening of October 21. Defendant's argument in this regard is that he had parked his Cadillac in front of Napoleon's home while he was up in northern Wisconsin, had been dropped off at Napoleon's after the trip by Martin Holtzman on the evening of October 21, and was therefore not in possession of the car at the time of his arrest. This argument was undercut by the testimony from the police officers, Napoleon and the informant that defendant's car was not parked on the street at the time of the informant's two controlled purchases. Furthermore, Napoleon testified that defendant drove over to his home on October 21, left his car keys on the kitchen counter, and then sold three ounces of cocaine to him in the back room of the garage. We conclude that any rational trier of fact could have found the essential elements of defendant's knowing possession, with the intent to deliver, of the three packets of cocaine found in his car beyond a reasonable doubt.

■ We next consider the charge based on the cocaine found in Napoleon's garage. Under section 401(a)(2) of the Act, the State had to prove that defendant knowingly delivered, or possessed with the intent to deliver, between 15 and 100 grams of cocaine. (Ill. Rev. Stat. 1987, ch. 56½, par. 1401(a)(2).) Viewing the evidence in a light most favorable to the State, we note that the police found two plastic baggies containing 80.49 grams of cocaine, or approximately three ounces, in Napoleon's garage, that Napoleon gave detailed testimony concerning his purchase of three ounces of cocaine from defendant for $850 an ounce, and that the transaction was corroborated by Napoleon's notebook ledger and the marked $100 bills found in defendant's pockets. We also note that the jury heard the following accountability instruction:

> "A person is legally responsible for the conduct of another person when, either before or during the commission of an offense, and with the intent to promote or facilitate the commission of that offense, he knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of the offense." (Illinois Pattern Jury Instructions, Criminal, No. 5.03 (2d ed. 1981).)

We conclude that any rational trier of fact could have found the essential elements, under an accountability theory, of defendant's knowing possession with the intent to deliver the three ounces of cocaine found in Napoleon's garage beyond a reasonable doubt.

Defendant's arguments as to why he was not proven guilty beyond a reasonable doubt focus on two areas: that he was not in actual possession of any of the cocaine recovered, and that parts of Napoleon's and the informant's testimony were contradicted by other testimony, thus impinging upon their credibility.

Defendant misses the mark by arguing that he did not possess the cocaine and that he is not accountable for Napoleon's actions. We have reviewed the evidence and find that the jury could have found him to be in constructive possession of the cocaine found in his car. As to the cocaine found in Napoleon's garage, the jury heard evidence that would support defendant's conviction of possession, with the intent to deliver, of that cocaine under an accountability theory. (See *People v. Pryor* (1988), 170 Ill. App. 3d 262, 269.) The jury heard testimony that defendant and Napoleon had an ongoing relationship based in illegal drug transactions; that defendant sold three ounces of cocaine to Napoleon minutes before the police executed the search warrant; and that Napoleon was apprehended with three ounces of cocaine in his constructive possession.

Defendant also misses the mark by arguing that the testimony of Napoleon and the informant is not believable. We have carefully reviewed the entire record and conclude that any inconsistencies in their testimony are minor. The jury verdict convicting defendant of the two charges means that the jury believed the State's witnesses and disbelieved defendant's two witnesses who testified as to his alleged trip to Menominee. As our supreme court stated in *People v. Boclair* (129 Ill. 2d at 474), that determination of credibility is within the province of the jury and is entitled to great deference.

### WAS MOTION FOR A MISTRIAL IMPROPERLY DENIED?

At issue is whether the trial judge erred by not granting defendant's motion for a mistrial, which followed Officer Simo's testimony that defendant would not allow the police to search his car. Defendant argues that the trial judge erred because Simo's testimony was highly prejudicial, allowing the jury to speculate that defendant had something he did not want the police to find in his car. The State responds that the trial court properly denied defendant's motion.

We initially note that a trial judge is vested with broad discretion in deciding whether to grant a motion for a mistrial. (*Illinois v. Somerville* (1973), 410 U.S. 458, 464, 35 L. Ed. 2d 425, 431, 93 S. Ct. 1066, 1070; see *People v. Howard* (1991), 147 Ill. 2d 103, 145.) "By virtue of his presence in the courtroom, the trial judge, rather than a court of review, is in a superior position to gauge the effect of an in-court occurrence on the jury." *Howard*, 147 Ill. 2d at 145.

■ "The focus of the mistrial motion after a witness has uttered an impropriety is whether the defendant was prejudiced by the remark. If so, what was the degree of prejudice, and can it be cured by special instructions to the jury?" (R. Ruebner, Illinois Criminal Procedure 327 (1987).) The trial judge found the remark to be prejudicial to defendant, but not so highly prejudicial as to require a mistrial. Immediately after denying defendant's motion for a mistrial in chambers, the judge returned to the courtroom and instructed the jury to disregard both the question and the answer. We believe the trial judge acted properly in this case. While we find that defendant may have been prejudiced by Officer Simo's answer, any possible prejudice was slight and quickly cured by the prompt limiting instructions from the trial judge.

We decline defendant's invitation that we analyze his motion for a mistrial under *Miranda* case law, specifically those cases such as *People v. Szabo* (1983), 94 Ill. 2d 327, 357-62, and *People v. Green* (1979), 74 Ill. 2d 444, 449-50, which discuss the treatment at trial of a defendant's silence either before or after *Miranda* warnings. We do not believe that issue is before us.

#### HEARING ON MOTION FOR NEW TRIAL

Six witnesses testified at the hearing on defendant's motion for a new trial on September 21 and 28, 1990: Kathy Lane (formerly Kathy Napoleon), Joe Hall, Raymond Jacobs, Sam Pedone, Officer Simo and John Werbach. Defendant alleged newly discovered evidence as a basis for the motion, most of which was targeted at impeaching Napoleon's testimony.

Kathy Lane testified first. She contacted the State's Attorney's office shortly after defendant's trial to try to get in contact with defendant. Mr. Michael Burke, Assistant State's Attorney, directed her to call defendant's attorney. Lane testified that prior to defendant's trial she was instructed by Napoleon, then her husband, or his attorney, "not to say anything[,] [j]ust to keep out of it." She stated that she was also told about the marital communications privilege.

She said that Napoleon threatened that if she volunteered information at defendant's trial, he would prolong the divorce and custody proceedings they were currently engaged in.

Lane stated that she knew defendant for five years and that she never saw defendant bring drugs to Napoleon. Lane testified that sometime prior to October 21, 1988, Napoleon borrowed $1,100 from defendant. She was unsure whether Napoleon ever paid defendant back. Lane stated that when Napoleon went out for errands on the evening of October 21, 1988, he was gone for an hour and a half. He arrived back at around 7 p.m., grocery bags in hand, and went to the garage. Defendant arrived at about 9 p.m.

Lane stated that she saw Napoleon in possession of defendant's car sometime before October 21, 1988, but could not specify the date. She added that defendant had previously left his car at Napoleon's home for extended periods of time. Lane stated that Napoleon often socialized at the Italian Club at Lake Street and Mill in Addison.

Ivan Joe Hall, from Tennessee, testified next. Hall was twice flown up to Illinois for the case by defendant. Each time, he was given $200 spending money by defendant. Hall's association with this case apparently centers around Napoleon's activities the night of October 21, 1988, although Hall could not state with certainty the dates of the activities he described. According to Hall, he and Napoleon met at the Italian Club in Addison on Friday night, October 14, 1988, and Hall played some pool. Hall stated that he was also at the Italian Club the next Friday evening, October 21. Napoleon walked in at around 6 p.m. At some point, he asked Hall to accompany him to the bathroom. Once inside the bathroom, Napoleon allegedly showed Hall a plastic bag of cocaine, laid out a couple of lines of the powder on the counter, and inhaled them through a rolled up dollar bill. Hall declined to use any of the cocaine. Napoleon then allegedly asked Hall to drive "one of his buddyies' [sic] cars over to his house": a black Cadillac with a black interior and no car phone. Hall testified that he agreed, followed Napoleon and parked the Cadillac in front of Napoleon's home. Hall also testified that he spoke with his friend Ray Jacobs at the golf course the next day, at which time he heard from Jacobs that Napoleon had been arrested the night before.

Raymond Jacobs testified next. Jacobs is a friend of defendant and Hall. Hall was living with Jacobs in October 1988. On October 21, 1988, Jacobs dropped Hall off at the Italian Club at around 6 to 7:30 p.m.

Sam Pedone, president of the Italian Club, testified next. Pedone stated that Napoleon used to frequent the club. Pedone testified that the club purchased a used pool table in 1982, licensed it each year it was in the club, and removed it sometime in 1985. That pool table was the only pool table in the club at that time. Pedone stated that there was no pool table in the club in October 1988.

Officer Simo testified next. Simo testified that after a request from the State's Attorney he interviewed Raymond Jacobs on April 11, 1990, regarding this case. Jacobs told Simo that he saw Hall on October 22, 1988, at a golf outing. Jacobs told Hall that both Napoleon and defendant had been arrested the night before. Simo also stated that when the police towed defendant's car, he noticed that it was a black car with a light brown interior and a car phone in plain view on the floor.

John Werbach, employed by the Village of Addison, was the last witness. Werbach testified that part of his official duties includes the distribution of licenses for pool tables in Addison businesses. Werbach testified that each license is valid from May 1 through April 30. He testified that he personally searched the records for pool table licenses for the years 1980 to 1990. He stated that the Italian Club had licenses for one pool table in 1983, 1984, 1985 and 1986.

At the close of testimony and argument, the trial judge questioned Kathy Lane's testimony, stating: "[s]he certainly appeared to me to be leaning over backward in an attempt to help the defendant overturn the conviction." The judge noted conflicts in the testimony of both Jacobs and Hall and stated that neither was a "clear and convincing" witness. The judge concluded that the testimony failed to overcome the presumption that attaches to a jury's verdict and that defendant failed to present facts which would likely result in a different verdict. The judge then denied defendant's motion for a new trial.

### WAS MOTION FOR A NEW TRIAL IMPROPERLY DENIED?

At issue is whether the trial court erred by denying defendant's motion for a new trial. Defendant argues that the testimony of Kathy Lane, Joe Hall and Raymond Jacobs was unknown and unavailable prior to and during the trial and that their testimony at the hearing adequately impeached Napoleon's testimony such that a new trial is required. The State responds that the trial judge properly denied defendant's motion in accordance with the standards

that this court set forth in *People v. DeCesare* (1989), 190 Ill. App. 3d 934.

In *People v. DeCesare* (1989), 190 Ill. App. 3d 934, this court stated:

"A defendant should receive a new trial based upon newly discovered evidence only if the following requisites are met: (1) the evidence must be of such a conclusive character that it will probably change the result upon retrial; (2) the evidence must be material to the issue and not merely cumulative; and (3) the evidence must have been discovered after the trial and not have been discoverable before trial through the exercise of due diligence. [Citation.] Such motions are not favored and will be subjected to the closest scrutiny." (*DeCesare*, 190 Ill. App. 3d at 943.)

(See *People v. Molstad* (1984), 101 Ill. 2d 128, 134.) The *DeCesare* test is very similar to the test articulated in *Jarrett v. United States* (7th Cir. 1987), 822 F.2d 1438, to which defendant refers.

We have carefully reviewed the testimony from the hearing on defendant's motion for a new trial. We agree with the trial court's determination that the testimony presented was unlikely to result in a different verdict upon retrial, which is the first element of the *DeCesare* test. Kathy Lane's testimony appears to this court to be largely the result of leading questions from defendant's attorney, which diminishes its credibility. The trial judge noted his skepticism of her testimony. Hall's credibility was greatly impaired by Sam Pedone's and John Werbach's testimony that there was no pool table at the Italian Club, where Hall allegedly played pool and saw Napoleon on October 21, 1988, in October 1988. We conclude that the trial court did not abuse its discretion in denying defendant's motion for a new trial. See *People v. Carlson* (1992), 224 Ill. App. 3d 1034, 1042.

### WAS DEFENDANT IMPROPERLY INDICTED?

The last issue raised by defendant is whether he was improperly indicted by the grand jury. Defendant argues that the second indictment, for the Class X felony charge based on the three ounces of cocaine found in Napoleon's garage, was improper because no new evidence was presented to the grand jury and because no record of the grand jury proceedings was provided to the court or defendant. Defendant characterizes the second indictment as "prosecutorial abuse." The State responds that defendant was properly indicted for the Class X charge.

■ While defendant argues that this issue alone is reversible error, he failed to bring it to the attention of the trial court. In *People v. Herrett* (1990), 137 Ill. 2d 195, our supreme court stated:

"[A] defendant must make a timely objection at trial and must renew the ground for objection in a written post-trial motion to preserve an error for review. [Citation.] The failure to make a timely objection at trial and to renew it in a post-trial motion operates as a waiver of the right to raise the issue as a ground for reversal on review." (*Herrett*, 137 Ill. 2d at 209.)

Defendant has not referred this court to an oral or written request that he made at trial for the transcripts from the May 26, 1989, grand jury proceeding. Furthermore, defendant failed to secure a ruling from the trial court on his amended motion to quash and dismiss the May 26 indictment. We note that within defendant's amended motion to quash he makes mention of the grand jury transcripts in paragraphs three and four as a basis for his claim that no new evidence was presented to the grand jury on May 26. Our reading of defendant's amended motion leads this court to conclude that he did indeed have access to a copy of the transcript, even though it is not now a part of the record on appeal. We conclude that by not bringing this alleged problem to the attention of the trial court, where an immediate solution may have been had, defendant has waived our consideration of the issue.

For the above reasons, the judgment of the circuit court of Du Page County is affirmed.

Affirmed.

DUNN and DOYLE, JJ., concur.