NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2021 IL App (4th) 180813-U

NO. 4-18-0813

IN THE APPELLATE COURT

FILED
March 23, 2021
Carla Bender
4th District Appellate
Court, IL

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Livingston County |
| STANLEY BOCLAIR, | ) | No. 84CF151 |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | Honorable |
| | ) | Jennifer H. Bauknecht, |
| | ) | Judge Presiding. |

PRESIDING JUSTICE KNECHT delivered the judgment of the court.
Justices Cavanagh and Steigmann concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed, finding the trial court did not err in denying
defendant's motion for leave to file a successive postconviction petition.

¶ 2    Defendant, Stanley Boclair, was convicted in 1986 of murder (Ill. Rev. Stat. 1983,
ch. 38, ¶ 9-1(a)(1)) and conspiracy to commit murder (Ill. Rev. Stat. 1983, ch. 38, ¶ 8-2(a)), and
he was ultimately sentenced to a term of natural life imprisonment. In 2018, defendant filed a
motion for leave to file a successive postconviction petition, which the trial court denied.
Defendant appeals, arguing he stated a colorable claim of actual innocence based on newly
discovered evidence "where newly obtained affidavits from three witnesses support that he was
not at the location of the murder at the time of the offense." For the reasons discussed below, we
affirm.

¶ 3                    I. BACKGROUND

¶ 4                    A. The Charges

¶ 5        In 1984, defendant was indicted on four counts of murder (Ill. Rev. Stat. 1983, ch. 38, ¶ 9-1(a)(1), (2)) and one count of conspiracy to commit murder (Ill. Rev. Stat. 1983, ch. 38, ¶ 8-2(a)). The indictments alleged defendant, while incarcerated at the Pontiac Correctional Center (Pontiac), "stabbed Thomas Riley with a dagger-like weapon, thereby causing the death of Thomas Riley." An additional indictment alleged defendant took part in a conspiracy to kill Riley.

¶ 6                    B. Evidence Presented at Defendant's Jury Trial

¶ 7        In 1986, defendant's case proceeded to a jury trial. Because the evidence has been thoroughly discussed by both the supreme court (see *People v. Boclair*, 129 Ill. 2d 458, 544 N.E.2d 715 (1989)) and this court (see *People v. Boclair*, No. 4-07-0347 (2008) (unpublished order under Illinois Supreme Court Rule 23)), we discuss only the evidence relevant to the issue raised on appeal.

¶ 8        The State's theory of the case was defendant and two other inmates, Robert Jones and Charles Jordan, killed Riley on or near the back of gallery seven of the south cellhouse at Pontiac, in furtherance of a conspiracy among several gang members. In support of its theory, the State called three inmates—Kenneth Broughton, James Cameron, and Craig Chothen—who testified to having witnessed the murder. Each of these witnesses testified they saw defendant stab Riley towards the back of gallery seven. The State also called a fourth inmate—Brian Trimble—who testified he overheard a group of gang members, including defendant, discussing their plans to kill Riley shortly before the murder occurred. Defendant denied any involvement in the murder or its planning. He testified he had breakfast shortly before the murder in the dining

- 2 -

hall located at the front of gallery five. He left the dining hall alone and returned to his cell on gallery seven.

¶ 9        The jury found defendant guilty of all counts, and he was ultimately sentenced to natural life imprisonment following a successful direct appeal challenging his initial sentence of death. See *Boclair*, 129 Ill. 2d at 495.

¶ 10                    C. Relevant Postconviction Proceedings

¶ 11        In 1992, defendant *pro se* filed his initial postconviction petition, in which he raised 38 alleged violations of his constitutional rights. The trial court summarily dismissed the petition, and defendant, through counsel, appealed. This court affirmed. See *People v. Boclair*, No. 4-92-0969 (1993) (unpublished order under Illinois Supreme Court Rule 23).

¶ 12        In 2005, defendant, through counsel, filed a second amended, successive postconviction petition, arguing actual innocence based on newly discovered evidence—(1) an affidavit from Kenneth Broughton recanting his trial testimony and (2) the results of DNA testing excluding Riley as the source of blood on most articles of defendant's clothing gathered by investigators after the murder, but not excluding Riley as the source of blood on defendant's left glove or shoes. Defendant's petition advanced to a third-stage evidentiary hearing, at which Kenneth Broughton, James Cameron, and Craig Chothen testified. For a discussion of each witnesses' testimony at the evidentiary hearing, see this court's Rule 23 order in *Boclair*, No. 4-07-0347 (2008) (unpublished order under Illinois Supreme Court Rule 23).

¶ 13        Following the evidentiary hearing, the trial court issued a lengthy written order denying defendant's successive postconviction petition. The court reasoned it found Broughton's recantation testimony incredible, while it found Cameron's and Chothen's testimony—both of whom reasserted they witnessed defendant stab Riley—to be credible. The court further reasoned

the new DNA evidence did not completely exclude defendant as the perpetrator of the crime and defendant failed to present any evidence challenging Brian Trimble's trial testimony he (defendant) took part in the conspiracy to commit murder. We affirmed the trial court's judgment on appeal. See *id.*

¶ 14          D. The Instant Motion for Leave to File a Successive Postconviction Petition

¶ 15          In 2018, defendant *pro se* filed the instant motion for leave to file a successive postconviction petition, raising a claim of actual innocence based on newly discovered evidence in the form of affidavits from three alleged alibi witnesses—James Barnwell, Jackie Wilson, and Amos Chairs—who were incarcerated at Pontiac at the time of the murder. Each witness averred they saw defendant exiting the dining hall at the front end of the south cellhouse while the murder was taking place at the back end. Defendant argued these three affidavits, coupled with Broughton's recantation and the DNA evidence, demonstrated his actual innocence.

¶ 16          James Barnwell's affidavit, signed August 15, 2016, averred he witnessed defendant exiting the dining hall at the front of gallery five as the murder occurred towards the back of gallery seven. Prison officials did not investigate Barnwell "but instead made mass shipments of [himself] and other inmates out of the prison and cellhouse," which prevented him from revealing defendant's innocence for more than 25 years. Barnwell was transferred to the same prison as defendant in 2016 and saw him in the law library, at which point he agreed to execute an affidavit for defendant.

¶ 17          Jackie Wilson's affidavit, signed August 17, 2016, averred defendant was directly behind him exiting the dining hall at the front of gallery five as the murder took place "in front of [Wilson] far in the back of seven and five gallery." In January 2016, a prison infirmary worker informed Wilson that defendant had recently been released from a mental health cell in the

prison, which led Wilson to later meet with defendant. Wilson did not come forward with this information sooner because he "never [would have] been forgiven" for helping "someone like '[defendant,]' " given his membership in a rival gang. Wilson's affidavit averred he could now provide the information because "prison gang culture ha[d] changed."

¶ 18 Amos Chairs's affidavit, signed August 19, 2016, averred he "acknowledged" defendant as he was eating in the dining hall on the morning of the murder and later "greeted" defendant as they were both leaving the dining hall. The affidavit further averred Chairs and defendant were exiting the dining hall as the murder occurred. Approximately one week later, Chairs learned defendant was the focus of the investigation. Chairs "later left Pontiac" and did not see defendant again until 2015, at which point he agreed to execute an affidavit for him.

¶ 19 Defendant also attached the Illinois Department of Correction's (DOC) "Report of Investigation" to his motion. The report shows nearly 200 individuals were interviewed about their knowledge of the murder. The interviewees were predominantly inmates housed in galleries five and seven and prison guards, but additional persons were also interviewed as a result of information gathered from the initial interviews. The DOC report further noted "[a]ctivity on 5 and 7 Galleries was monitored by the gallery video cameras ***."

¶ 20 The trial court denied defendant leave to file his successive postconviction petition, noting from a review of the record, "it appear[ed] that defendant had the benefit of a private investigator to conduct interviews" and he failed to explain why the affiants' testimony could not have been raised in his initial petition. Defendant filed a motion to reconsider, which the court also denied.

¶ 21 This appeal followed.

¶ 22 II. ANALYSIS

¶ 23 On appeal, defendant argues the trial court erred in denying him leave to file a successive postconviction petition because he raised a colorable claim of actual innocence based on newly discovered evidence "where newly obtained affidavits from three witnesses support that he was not at the location of the murder at the time of the offense." This court reviews the denial of leave to file a successive postconviction petition alleging actual innocence *de novo*. *People v. Robinson*, 2020 IL 123849, ¶ 40.

¶ 24 The Postconviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2016)) is not a substitute for an appeal but provides a statutory mechanism for criminal defendants to collaterally attack a conviction resulting from an alleged substantial denial of their constitutional rights at trial. *Robinson*, 2020 IL 123849, ¶ 42. Given its collateral nature, "only one postconviction proceeding is contemplated under the Act." *Id.* An exception to the bar against successive petitions, relevant to the instant appeal, "is where the [defendant] asserts a fundamental miscarriage of justice based on actual innocence." *Id.* To make such an assertion, the defendant must first obtain leave of court. *Id.* ¶ 43. At this initial pleading stage, all well-pleaded allegations in the petition and attached affidavits not positively rebutted by the record must be accepted as true. *Id.* ¶ 45. "[L]eave to file a successive petition should be denied only where it is clear from a review of the petition and supporting documentation that, as a matter of law, the petition cannot set forth a colorable claim of actual innocence." *Id.* ¶ 44.

¶ 25 To set forth a colorable claim of actual innocence, "the supporting evidence must be (1) newly discovered, (2) material and not cumulative, and (3) of such conclusive character that it would probably change the result on retrial." *Id.* ¶ 47 (citing *People v. Edwards*, 2012 IL 111711, ¶ 32, 969 N.E.2d 829). "Newly discovered evidence is evidence that was unavailable at trial and could not have been discovered sooner through due diligence." *People v. Harris*, 206

Ill. 2d 293, 301, 794 N.E.2d 181, 187 (2002). Material evidence is evidence that "is relevant and probative of the [defendant's] innocence"; noncumulative evidence is evidence that "adds to what the jury heard." *People v. Coleman*, 2013 IL 113307, ¶ 96, 996 N.E.2d 617. "Lastly, the conclusive character element refers to evidence that, when considered along with the trial evidence, would probably lead to a different result." *Robinson*, 2020 IL 123849, ¶ 47.

¶ 26        Here, defendant, relying on *People v. Ortiz*, 235 Ill. 2d 319, 919 N.E.2d 941 (2009) and *People v. Williams*, 392 Ill. App. 3d 359, 910 N.E.2d 627 (2009), argues the three affidavits attached to his motion constitute newly discovered evidence because the affiants "were unknown and unavailable to [him] at the time of trial." The State contends the affidavits cannot be considered newly discovered because "it would have been obvious and easy for defendant to have revealed the three alibi witnesses to officers during the early investigations, to have interviewed them himself, and/or to have asked officers or others to interview those inmates."

¶ 27        In *Ortiz*, the defendant was convicted of murdering the victim in a Chicago park. *Ortiz*, 235 Ill. 2d at 322. Ten years after the murder, an eyewitness to the murder admitted to the defendant's mother that he knew the defendant had not committed the crime and agreed to execute an affidavit stating as much. *Id.* at 334. In finding the affidavit constituted newly discovered evidence, the supreme court noted the affiant alleged he was in an area of the park "where he would not have been seen by [the] defendant ***." *Id.* The court further noted the affiant "essentially made himself unavailable as a witness" by fleeing to Wisconsin shortly after the murder. *Id.* Based on these two factors—the witness being (1) unknown to the defendant and (2) unavailable due to his flight to another jurisdiction—the supreme court concluded the affidavit constituted newly discovered evidence. *Id.*

¶ 28        Despite defendant's conclusory assertion to the contrary, the factors relied on by the supreme court in *Ortiz* are not present in this case. First, the murder in *Ortiz* took place in a public park in a major metropolitan area, and the defendant did not know, and had no way to know, that the affiant witnessed the murder. *Id.* It would have been practically impossible for the defendant to locate and interview every person who could have possibly been in the park at the time of the murder. In this case, however, the murder took place in a prison. Unlike a park in Chicago that can be accessed by any resident or visitor to the city, a prison is a heavily secured and monitored building housing a finite population, making it much easier to interview potential witnesses through due diligence. Also, unlike the defendant in *Ortiz* who had no way of knowing the affiant witnessed the murder, defendant here could have known the three affiants saw him at the time of the murder, given their personal acquaintance and close physical proximity. Indeed, Wilson's affidavit averred he was directly in front of defendant at the time of the murder and Chairs's affidavit averred he greeted defendant for the second time that morning moments before the murder occurred.

¶ 29        As for the second factor, namely, the affiants' unavailability, the facts of the instant case are again distinguishable from those in *Ortiz*. In *Ortiz*, the witness fled to another jurisdiction after the murder, making it difficult for investigators to locate him. *Id.* Here, neither Barnwell nor Chairs allege they would not have testified for defendant had they been approached by investigators or subpoenaed by defense counsel. Although Wilson alleged he would not have helped defendant because defendant was a rival gang member, which we must accept as true, this is insufficient to establish his unavailability. As noted above, Wilson's own affidavit averred he was directly in front of defendant at the time of the murder, yet the record does not show any attempt was made to subpoena him. See *People v. Edwards*, 2012 IL 111711, ¶¶ 35-37, 969

N.E.2d 829 (finding two affiants could not be considered unavailable—despite their allegations they refused to testify for the defendant—"where there was no attempt to subpoena [the affiants], and no explanation as to why subpoenas were not issued").

¶ 30      Defendant also relies on *Williams* for the proposition that "evidence from a witness can be new if the[ ] witness made themselves unavailable and did not provide an affidavit swearing to their observations until after a defendant's conviction." In *Williams*, the defendant was convicted of multiple offenses he allegedly committed with four accomplices. *Williams*, 392 Ill. App. 3d at 361. The defendant filed a third postconviction petition, after filing the initial two petitions *pro se*, and attached an affidavit from one of the alleged accomplices and from an individual who participated in the crimes but was not identified until a later date, both of whom attested they misidentified the defendant under pressure from police. *Id.* at 363-65. The First District concluded the two affidavits attached to the petition constituted newly discovered evidence. *Id.* at 369. The court reached its conclusion after highlighting the former affiant was an alleged accomplice in the crimes and had refused numerous requests to help the defendant, while the latter affiant was not properly identified until the defendant obtained *pro bono* counsel who began investigating his claim of innocence. *Id.*

¶ 31      Here, neither of the bases relied on by the *Williams* court in finding the evidence newly discovered are present. None of the affiants in the instant case were alleged to have been accomplices in the crime, thereby precluding defendant from arguing they were unavailable due to their fifth amendment right to avoid self-incrimination. See, *e.g.*, *Edwards*, 2012 IL 111711, ¶ 38 ("[The affiant] was a codefendant, with a fifth amendment right to avoid self-incrimination. No amount of due diligence could have forced him to violate that right if he did not choose to do so."). Nor can defendant argue, as the defendant in *Williams* argued, his *pro se* status leads to a

finding that fundamental fairness requires full consideration of his successive petition. The record shows defendant has received private legal representation, along with the services of a private investigator, in nearly every proceeding spanning from 1985 to the instant successive petition filed in 2018.

¶ 32       Moreover, we note defendant has failed to respond to the State's argument that he could have told investigators—either his own investigators or the State's—about his alibi, and through due diligence those investigators could have discovered the inmates who were in or around the dining hall at the time of the murder. Defendant concedes he did not tell IDOC investigators about his alibi during the interviews shortly after the murder. In addition to not disclosing his alibi to the State's investigators, defendant also had a private investigator working on his case, yet he neglects to offer a single explanation as to why his investigator would not have been able to locate the affiants sooner with due diligence. The documents attached to defendant's motion show the prison was under video surveillance, and there were a finite number of people the investigators would have had to interview about potentially corroborating defendant's alibi. Even if the affiants were transferred to a different cellhouse or prison, there would have been records revealing to which location they were sent. Accordingly, because defendant has failed, as a matter of law, to sufficiently plead facts demonstrating the three affidavits attached to his motion for leave could not have been discovered sooner through due diligence, we cannot characterize his proposed evidence as newly discovered, and we affirm the trial court's judgment.

¶ 33                          III. CONCLUSION

¶ 34       For the reasons stated, we affirm the trial court's judgment.

¶ 35       Affirmed.

- 10 -